COMMONWEALTH vs. JOHN J. TASSINARI.

Plymouth. May 10, 2013. - September 9, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, & DUFFLY, JJ.

*Homicide. Evidence,* Hearsay, State of mind, Motive, Prior misconduct,
Spontaneous utterance, Relevancy and materiality, Photograph, Firearm.
*Firearms. Jury and Jurors. Practice, Criminal,* Capital case, Jury and
jurors, Argument by prosecutor, Instructions to jury.

At a murder trial, testimony from the victim's sister-in-law about the victim's
request for a divorce from the defendant was properly admitted under the
state-of-mind exception to the hearsay rule, where the statements were
relevant to the victim's hopes for a divorce, her dissatisfaction with her
marriage, and the defendant's response to those issues, and were also
relevant to the defendant's motive to kill the victim because he was aware
of her state of mind at the time of the crime [346-347]; similarly, testimony
from the victim's best friend about the victim's statements regarding an
incident that occurred a few weeks before the victim's death were admis-
sible as an excited utterance of the victim, where the incident was a suf-
ficiently startling event and the victim's reaction was spontaneous rather
than the result of reflective thought, where the statements were relevant to
the couple's ongoing difficulties, and where the testimony of the best
friend was not overly prejudicial, given the defendant's own characteriza-
tion of the event and in light of the judge's instruction to the jury [347-349].
At a murder trial, the judge did not abuse his discretion in admitting in evi-
dence three autopsy photographs, where each photograph revealed a differ-
ent way the victim was wounded, and where the judge excluded duplica-
tive photographs; further, even if the admission in evidence of a certain
photograph of the defendant were error because it depicted the defendant
as aggressive, the admission did not warrant a new trial, given that other
testimony could have led the jury to the same conclusion. [349-350]
At a murder trial, the admission of evidence that the defendant viewed
pornographic Web sites, as well as evidence of electronic communications
with the victim (the defendant's wife) describing the couple's consensual
sexual practices, did not constitute impermissible character evidence of the
defendant as an aggressor, but provided evidence of the defendant's state
of mind in the weeks prior to the murder and supported the Commonwealth's
theory that the defendant's anger toward the victim regarding sexual activi-
ties could have contributed to his intent to kill with premeditation; further,
the judge took steps to insure that the probative value of the evidence was
not substantially outweighed by the danger of unfair prejudice, e.g., asking
jurors in individual voir dire whether he or she could view such types of
evidence impartially and excluding graphic photographs of the victim and

of sexual paraphernalia or the content of pornographic Web sites as irrelevant. [350-352]

At a murder trial, the judge did not abuse his discretion in admitting evidence of the defendant's numerous firearms and his firearm-related credentials, where such evidence was relevant to the Commonwealth's theory of premeditation, particularly whether the defendant chose from his collection the two guns that he used to shoot the victim; further, the erroneous admission of evidence that the defendant was a member of a firearm-related group could not have substantially swayed the jury, given the properly admitted evidence of the defendant's license to carry firearms and his status as a firearms instructor. [352-353]

Even assuming that the judge at a criminal trial erred in not excusing a juror who, during deliberation, brought to the judge's attention an issue about the juror's dual citizenship status, the defendant did not demonstrate that he was prejudiced by the juror's presence on the jury. [353-354]

At a murder trial, the prosecutor, in closing argument, did not impermissibly suggest to jurors that they must decide whether the law regarding heat of passion was no longer acceptable; rather, the prosecutor properly distinguished between a killing committed with heat of passion (i.e., where the defendant was sufficiently provoked) and one committed with premeditation. [354-356]

At a murder trial, the judge did not err in declining the defendant's requested jury instruction and instead using the model jury instructions, which permitted the jury to determine whether the victim's statements that she was unfaithful to the defendant (her husband) constituted a sudden revelation giving rise to reasonable provocation; further, the order of the instructions (first defining murder and malice, then defining how malice may be negated by mitigating circumstances) was not error, and the instructions were not contradictory and did not convey implicit instructions. [356-357]

INDICTMENT found and returned in the Superior Court Department on June 20, 2008.

The case was tried before *Jeffrey A. Locke,* J.

*Robert F. Shaw, Jr.,* for the defendant.

*Mary E. Lee,* Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. On November 1, 2010, a jury found the defendant guilty of murder in the first degree of his wife on the theories of deliberate premeditation and extreme atrocity or cruelty. The defendant argues error in the admission of evidence; the judge's failure to exclude a juror based on the juror's assertions of dual citizenship; portions of the prosecutor's argument; and jury instructions. He also seeks relief pursuant to G. L. c. 278, § 33E. Because we discern no error requiring reversal of the defendant's conviction, and see no reason to exercise our power under G. L. c. 278, § 33E, we affirm.

1. *Background.* The defendant admitted to shooting and killing his wife, the victim, in the driveway of their home on April 22, 2008. The main issue at trial was whether the shooting was a result of the defendant's sudden heat of passion.

a. *The Commonwealth's case.* We present the essential facts the jury could have found, reserving certain details for our discussion of the issues.

The defendant and the victim were married in November, 2004, after a relationship of approximately two years. At the time of the murder, the couple lived next door to the victim's brother and his wife, with whom they regularly socialized. The defendant was a licensed firearms instructor who owned six handguns and one target rifle, all of which were licensed. He stored the guns and various types of ammunition in a gun safe in the closet in his bedroom. Some of the guns in the safe were kept loaded. He also carried a gun during the day, taking it off only to shower and go to sleep at night.

In the months prior to the murder, the defendant and the victim were experiencing tension in their marriage and discussed divorce on more than one occasion. The defendant and victim discussed these difficulties in electronic communications with each other.[1] According to the victim's sister-in-law, in whom the victim confided, the victim had asked the defendant for an "open marriage" because she hoped the defendant would find someone else and "would go off with that person and leave her alone." The victim also told her sister-in-law that she had asked for a divorce about three months before her death, and that the defendant wanted to stay in the house until the divorce became final.

The defendant told the victim he "couldn't bear the thought of . . . going outside the marriage." He communicated to his coworker and parents that he and the victim had discussed having an open marriage and told his parents that he had some "pretty serious marital problems" and had researched divorce

---

[1]Electronic communications comprised much of the evidence of the couple's relationship in the months leading up to the murder. The couple exchanged messages nearly continuously during the day. As part of their investigation, State police conducted a forensic examination of the defendant's home and work computers, and the victim's computer. The parties stipulated to the authentication of the evidence from the computers. Telephone records from both the victim and the defendant were also introduced.

on the Internet. In an electronic communication to the victim on April 11, 2008, the defendant stated that he would "be gone in 18 months" because he believed, based on his research, that a divorce would be finalized in that period of time.[2]

In other electronic exchanges that month, the defendant told the victim he was concerned about her upcoming plans to go on vacation to a dog show with her best friend because he was worried about other men being there. In these communications and in his testimony at trial, the defendant also expressed his resentment concerning the time the victim spent on her computer and stated that he felt she was choosing the computer over him. The defendant conveyed his disappointment that he and the victim did not have sexual relations as often as they had in the past and accused the victim more than once of having an affair. Approximately two weeks before the shooting, the defendant acknowledged to the victim that he was "controlling" and "need[ed] to work on trusting [her] more." The victim repeatedly denied that she was having an affair. She told the defendant that, when she spent time on the computer with other people, "[she] was just looking for a small bit of [her] own time," and accused the defendant of being upset when she did not acquiesce to his requests. The victim believed the defendant to be "insecure," "obsessive," and "controlling."

At trial, the Commonwealth highlighted two events leading up to the murder. On April 10, the defendant had anticipated spending the evening with the victim, but the defendant became angry and left the house. The victim called her best friend on the telephone and told her that this was the first time she thought the defendant would hit her. The second event occurred on April 20, 2008, when the victim went out with a group of girl friends, which was unusual for her. The defendant telephoned or sent text messages to the victim twelve times between 8:25 P.M. and 1:48 A.M. In the electronic communications between the defendant and the victim the next day, the defendant expressed

[2]In the months before the murder, the couple frequently discussed their relationship in instant messages, text messages, and electronic mail. The electronic communications also show that, interspersed with issues such as child care and grocery shopping, the couple shared links to pornographic Internet sites, the specific content of which was excluded at trial, and routinely discussed their sexual interests and practices.

his concern that the victim "[could not] handle herself" and that other men would take advantage of her while she was on vacation.

One day later, the day of the shooting, the defendant believed the couple would spend the evening together. The victim was typing on her computer while the couple was watching television. When the defendant asked her who she was communicating with, the victim told the defendant that she was talking to some friends and that she could "talk to whoever [she] want[ed] and do whatever [she] want[ed]." The defendant left the room "to see how long it would take for her to notice that [he] had gone upstairs." When the victim asked him whether he would be returning to watch television, he told her that it was "rude" that she "disappeared into cyberspace" when they were supposed to be spending time together. At 9:17 P.M., the victim telephoned her sister-in-law and went next door to talk with her in order to defuse the situation.

After the victim left the house, the defendant contacted her and asked whether she had worn a sweatshirt to cover the tight-fitting shirt she was wearing and when she would return home. The victim responded that she would be home after she finished her tea. At 9:50 P.M., the defendant viewed three images on his computer: one of himself with a dog baring its teeth, one of a gun, and one pornographic image. The defendant also called his mother, with whom he spoke from 9:50 until 10:02 P.M., and told her that the victim was talking about "other guys again." At some point while the defendant was talking to his mother, the victim returned home.

At 10:08 P.M., witnesses heard multiple gunshots. A waitress from a nearby restaurant saw the defendant leave from the rear door of his house. The surrounding lights were bright enough for her to see him on the back steps of his porch. He walked very quickly down the back stairs into the yard, firing a gun. She heard several shots, a woman scream, and two more shots. She then heard metal hitting the ground and saw the defendant move quickly back up the stairs into the house. He went inside, shut off the interior lights, and came back outside. She then heard another set of shots.[3]

---

[3]In one 911 call to police admitted in evidence, the second round of shots can be heard in the background.

Immediately after killing the victim, the defendant telephoned 911 and told police that his wife had been cheating on him for a long time, that he killed her by shooting her more than twelve times, that there were two guns, and that he would wait for them. When police officers arrived at the home, they found the deceased victim at the end of the driveway, surrounded by casings and ammunition.

The victim had been shot eighteen times. She had wounds to her head, torso, and legs. Multiple bullets and bullet fragments were found in the victim's body and clothing. The medical examiner stated that some of the "wound tracks were consistent with [the victim] having been lying down and receiving those gunshots to the top of her head" and that the wounds to the victim's inner ankle and the back of her thigh would not have been fatal. The cause of death was injuries to the skull, brain, spine, heart, lung, kidney, spleen, stomach, intestines, and major blood vessels.

b. *The defendant's case.* To support his theory that the victim was involved with other men, the defendant introduced evidence about the victim's participation in an Internet chat room about dogs, as well as telephone records showing the victim communicated with two men without the defendant's knowledge. The defendant emphasized that in many electronic communications in the months prior to the murder, even after the victim and the defendant had argued, the couple expressed their love and care for each other.

The defendant testified about the night of the murder, stating that, after he saw his wife return home, he had gone into the bedroom alone, opened up his gun safe to put his gun away, and was interrupted by the victim entering the bedroom. He and the victim then had a conversation about "all these other guys," who might take advantage of her during her vacation. When the victim screamed, "Fine. I've been having an affair," and that she did not love him, he "lost control." In the next few moments, he could only remember reaching toward the gun safe and seeing the victim's face. He next found himself in the driveway holding an empty pistol. The defendant argued that the victim's sudden statement of infidelity caused him to lose control and that learning of his wife's infidelity was reasonable provocation for the defendant to lose control in the heat of passion.

To support this theory, the defendant introduced evidence (1) that while he was in the driveway immediately after the shooting, he told his mother, father, and brother-in-law that he killed his wife because she was cheating on him; and (2) that he told police that he killed his wife because she was unfaithful. Four witnesses testified for the defendant. The defendant's mother, father, and coworker stated that on the day of the murder, the defendant had not exhibited any unusual behavior. An expert in forensic psychology, who also testified for the defense, stated that the defendant was not suffering from a mental illness at the time of the murder, but that he has difficulties "looking at unpleasant circumstances," that he "works really hard to not deal with that [unpleasantness] until such time as he can't avoid it," and that the defendant's personality traits were "obsessional," "self-centered, pleasure oriented, and manipulative."

The defense also proposed the theory that there was tension in the marriage because the couple was experiencing financial difficulties related to improvements to their home, the purchase of three dogs, and the couple's two vehicles. The defendant stressed the fact that the couple went out to dinner two nights before the murder and had seemed happy.

2. *Admission of evidence.* The defendant argues that he is entitled to a new trial because much of the Commonwealth's evidence constituted inflammatory "bad act" or character evidence and because the judge did not adequately instruct the jury at the end of trial. We consider each in turn.

a. *Testimony of victim's sister-in-law and best friend.* The defendant argues that the judge erred in admitting evidence by the victim's sister-in-law and the victim's best friend. He asserts that testimony from these witnesses was based in hearsay and was misused by the prosecutor at trial.

The victim's sister-in-law, who had spoken with the victim minutes before the shooting, testified about the victim's request for a divorce, which had occurred about three months before the murder. She stated that the victim told her she was "having a hard time dealing with [the defendant] and how he was," that she wished the defendant would move out, and that she had suggested an open marriage so that the defendant "would go off with that person and leave her alone." She also testified that she

never saw any aggressiveness or violence between the victim and the defendant.

An out-of-court statement, if offered to prove the truth of what is asserted, is generally inadmissible. *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997), *S.C.*, 440 Mass. 576 (2003). However, "[t]he state-of-mind exception to the hearsay rule calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when and only when there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it." *Id.*, and cases cited.

Here, the statements are relevant to the victim's hopes for a divorce, her dissatisfaction with the marriage, and the defendant's response to those issues. See *Commonwealth* v. *Borodine*, 371 Mass. 1, 7-9 (1976), cert. denied, 429 U.S. 1049 (1977). They are also relevant to the defendant's motive to kill the victim because he was made aware of her state of mind at the time of the crime through their electronic communications. See *Commonwealth* v. *Bins*, 465 Mass. 348, 366 (2013); *Commonwealth* v. *Andrade*, 422 Mass. 236, 239 (1996). There was no error.

The victim's best friend testified to the victim's statements regarding an incident that occurred a few weeks before the victim's death. At the start of this testimony, the judge instructed the jury that the testimony could be used only to understand the couple's relationship. The witness stated that the victim had called her late one evening, "scared" and crying, and said that when she told the defendant she was not interested in having sexual relations with him, "he ripped the covers off of her and he was very close to her face and she thought he was going to hit her."

After conducting a voir dire, the judge found that the best friend's testimony was relevant to demonstrate an ongoing hostility or discord within the marriage; the statements were not unduly prejudicial; and, because the victim was "at that time communicating while still under the sway of the event," the statements were an excited utterance.

The defendant asserts that the admission of this testimony was error because it did not constitute an excited utterance and

functioned as evidence of the defendant's prior misconduct to show the defendant's bad character. He also argues that the testimony was unclear and differed from that of the defendant and that the prosecutor misused the testimony during closing argument. There was no error.

The contested testimony constitutes an excited utterance because there was a "sufficiently startling" event and the victim's reaction was spontaneous, rather than the "result of reflective thought." *Commonwealth* v. *Santiago*, 437 Mass. 620, 623 (2002), quoting 2 McCormick, Evidence § 272, at 204 (5th ed. 1999). The statements were not testimonial in nature because they "were not made in a deposition, affidavit, confession, or prior testimony, or in response to law enforcement interrogation." *Commonwealth* v. *Linton*, 456 Mass. 534, 550 (2010). In addition, the record supports the judge's determination that the victim's best friend was competent and had personal knowledge of the event. See *Commonwealth* v. *King*, 436 Mass. 252, 255 (2002).

The statements concerning the incident also were relevant to the couple's ongoing difficulties, revealed in this incident where the frightened victim "qualif[ied], characterize[d] and explain[ed] the underlying event." *Commonwealth* v. *DiMonte*, 427 Mass. 233, 236 (1998), quoting *Commonwealth* v. *Crawford*, 417 Mass. 358, 362 (1994). Moreover, the defendant's testimony concerning the same incident is arguably more prejudicial than that of the victim's best friend because he stated that he "violently" pulled off the blankets, said he did not want to be married to a "bitch" or a "whore," took off his wedding ring and left it on the night stand, and told her, "We're through."[4] As to the matter of differences between the best friend's testimony and other testimony, the jury must determine "the weight and credibility of the evidence." *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005), *S.C.*, 450 Mass. 215 (2007), and 460 Mass. 12 (2011). The testimony of the victim's best friend was not overly prejudicial given the defendant's own characterization of the event

---

[4]The jury fairly could have inferred that the event described by the victim's best friend was the same incident as the one described by the defendant and referenced in text messages between the couple on April 11, 2008. See *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980) (inference is permissible if it is reasonable and possible).

and in light of the judge's instruction. See *Commonwealth* v. *Williams*, 450 Mass. 645, 651 (2008) ("Jurors are presumed to follow a judge's instructions"). Finally, the prosecution did not mischaracterize the testimony in closing argument because the prosecutor referenced the defendant's testimony about that night and used it to show the nature of the couple's relationship. See *Commonwealth* v. *Ferreira*, 381 Mass. 306, 316 (1980) (closing argument may include "suggestions by counsel as to what conclusions the jury should draw from the evidence").

b. *Photographs.* The defendant objected at trial to the admission in evidence of three autopsy photographs and a photograph of himself with one of his dogs. He argues that the autopsy photographs were "grotesque," the dog photograph provided no insight regarding the defendant's state of mind, and that they were therefore unduly prejudicial.

"The admissibility of photographic evidence is left to the discretion of the trial judge . . . ." *Commonwealth* v. *Waters*, 399 Mass. 708, 715 (1987). "[I]f the photographs possess evidential value on a material matter, they 'are not rendered inadmissible solely because they are gruesome or may have an inflammatory effect on the jury.' " *Commonwealth* v. *Ramos*, 406 Mass. 397, 407 (1990), quoting *Commonwealth* v. *Bys*, 370 Mass. 350, 358 (1976). Here, the contested autopsy photographs depicted the extensive and serious injuries to the victim's head. These photographs comprised a small portion of the exhibits from the medical examiner and the police investigation, and each revealed a different way the victim was wounded, including one photograph of the victim's fractured and open skull. See *Commonwealth* v. *Urrea*, 443 Mass. 530, 545 (2005) (eleven autopsy photographs not prejudicial where each showed different injury). These photographs also were relevant to the defendant's intent and whether the murder was premeditated and committed with extreme atrocity or cruelty, see *Commonwealth* v. *Obershaw*, 435 Mass. 794, 803 (2002); *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), and were not unduly prejudicial because they depicted the victim's wounds. The judge, who excluded duplicative photographs of the victim, did not abuse his discretion in admitting the autopsy photographs. See *Commonwealth* v. *Olsen*, 452 Mass. 284, 293-294 (2008).

During cross-examination of the defendant at the end of trial, over the defendant's objection, the Commonwealth introduced a picture of the defendant with one of his dogs,[5] which was one of three that the defendant had viewed on his computer minutes before the murder. The defendant testified that he did not remember looking at the photograph that night. The defendant argues that this photograph is inflammatory because, in addition to not being relevant to the murder, it shows the defendant as an aggressive individual. The Commonwealth contends that the prosecutor was impeaching the defendant's statement that he needed firearm protection within his home, despite the couple's three dogs, a fenced-in backyard, and a deadbolt on the door.

The Commonwealth offered this photograph immediately before the close of evidence, rather than earlier at trial, which could have left the jury with a particular visual impression of the defendant as an aggressive individual. Assuming, without deciding, that the admission of the photograph was error because it depicted the defendant as aggressive, however, the admission of the photograph does not warrant a new trial. See *Commonwealth* v. *Peixoto*, 430 Mass. 654, 660-661 (2000). The testimony of the victim's best friend that the victim was "scared" one night after an altercation, the defendant's statements that he shot the victim multiple times, and the characterization of the defendant by the defendant's forensic psychologist could have led the jury to a similar conclusion.

c. *References to sexual material.* At trial, the defendant objected to the admission of evidence that referenced the defendant's viewing of pornographic Web sites and the admission of unredacted portions of electronic communications describing sexual practices the defendant has termed "Bondage Dominance Submission Masochism." He asserts these references were irrelevant and had a tendency to depict him as having a propensity for aggression.[6] Portions of the electronic communications

---

[5]In the photograph, the dog's teeth are bared as he runs toward an unknown person. The defendant, who is holding the dog's leash, is looking intently at the object of the attack.

[6]After a pretrial hearing, the judge denied the defendant's motion to suppress evidence seized from the external hard drive to the defendant's home computer. At trial, the judge sustained the defendant's objection to evidence that the links to pornographic Web sites were saved as "bookmarks" on the defendant's computer.

concerning this evidence were read in evidence, and the entirety of the instant messaging conversations referencing these sexual practices was presented to the jury in written form. These communications reference numerous details of the couple's consensual sexual practices and their shared viewing of pornographic sites.

"All evidence, including that of a violent or sexual nature, must meet the threshold test of relevancy; that is, it must have a 'rational tendency to prove an issue in the case . . . .' " *Commonwealth* v. *Carey*, 463 Mass. 378, 387 (2012), quoting *Commonwealth* v. *LaCorte*, 373 Mass. 700, 702 (1977). Even if the evidence is relevant, it "may not be admitted if 'its probative value is substantially outweighed by the danger of unfair prejudice.' " *Commonwealth* v. *Carey*, *supra* at 387-388, quoting Mass. G. Evid. § 403 (2012). The evidence concerning the couple's sexual practices does not constitute impermissible character evidence of the defendant as an aggressor.

Here, the judge asked each juror during individual voir dire whether they could view such types of evidence impartially, and dismissed those who did not answer in the affirmative.[7] The communications also provided evidence of the defendant's state of mind in the weeks prior to the murder and supported the Commonwealth's theory that the defendant's anger toward the victim regarding sexual activities could have contributed to his intent to kill with premeditation.[8] See *Commonwealth* v. *Carey*, *supra* at 389 (defendant's photographs of women being strangled and Internet searches related to strangulation were probative of his state of mind). In the context of the lengthy electronic communications between the couple, the contested references to sexual practices demonstrated that these consensual activities were a part of the couple's day-to-day discussions and that they viewed their sexual relations as an important part of their relationship. See *id.* at 387. Further, the judge properly exercised his discretion when he did not allow graphic photographs

---

[7]During individual voir dire, the judge referenced issues of "unconventional" sexual practices such as open marriage, "bondage," and "domination or submission."

[8]The jury could have found that the evidence of a sexual nature was relevant to the defendant's state of mind immediately before he shot the victim. See *Commonwealth* v. *Carey*, 463 Mass. 378, 389 (2012) (images stored on defendant's computer were relevant to and probative of his state of mind).

of the victim, which had been saved on the defendant's computer, see *Commonwealth* v. *Berry*, 420 Mass. 95, 109 (1995), and pictures of the sexual paraphernalia or the content of the pornographic Web sites referenced in the couple's communications because they were irrelevant and unduly prejudicial. *Commonwealth* v. *King*, 387 Mass. 464, 475 (1982).

d. *The defendant's firearms.* The defendant asserts that introduction of his numerous firearms, as well as evidence of his training and certification as a firearms instructor, constituted impermissible character evidence. He concedes that the evidence was relevant to his carrying and storage practices, but argues he was prejudiced by an excessive focus on this evidence. We review to determine whether there was prejudicial error. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

Police recovered a .45 caliber Glock semiautomatic pistol on the ground next to the victim and a .40 caliber Glock semiautomatic pistol on the ground in the backyard. These weapons had a capacity of thirteen rounds each, and there were twenty-six discharged shell casings consistent with the type of ammunition that would be used for these weapons.[9] The ammunition found at the scene and in the victim's body was hollow point ammunition that opens and expands on impact. The Commonwealth also introduced the defendant's license to carry firearms, firearms instructor certification, business card as a firearms instructor, and membership card to the National Rifle Association. The defendant's other firearms,[10] holsters, and ammunition found in the defendant's safe, as well as ammunition of the type of caliber for each gun, were also in evidence.

"[W]e have not unconditionally disapproved of the admission of weapons-related evidence unconnected to the commission of a crime." *Commonwealth* v. *Barbosa*, 463 Mass. 116, 122 (2012), and cases cited. Information about the defendant's

---

[9]An officer with the State police firearms division testified that the casings found at the scene had an "insufficient amount of striations" to connect the ammunition to the two guns found at the scene to the ammunition. The weapons belonging to the defendant and used in the shooting were not in dispute at trial.

[10]Police found the following firearms in the defendant's gun safe: a loaded .357 caliber revolver; a loaded .44 caliber magnum revolver; an unloaded AR-15 assault rifle; an unloaded .22 caliber target pistol; and an unloaded .22 caliber long rifle.

firearms and firearm-related credentials was relevant to the Commonwealth's theory of premeditation, particularly whether the defendant deliberately chose the two guns that he used to shoot the victim from his collection of firearms. See *Commonwealth* v. *Hodge (No. 2)*, 380 Mass. 858, 863 (1980) (defendant's proficiency with firearms relevant to deliberate shooting of victim); *Commonwealth* v. *Bonomi*, 335 Mass. 327, 356 (1957) (injuries showed conscious purpose to kill continuing for length of time and warranted finding of murder committed with premeditation). The evidence of the guns and the defendant's licensing information demonstrated his access to each firearm, his familiarity with how each operated, and the appropriate ammunition for each. The evidence also was relevant to the issue whether the murder was committed with extreme atrocity or cruelty. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983).

Where the main issue at trial is whether the defendant acted in the heat of passion or killed his wife with premeditation (as was the case here), the evidence of his firearms and his access to them is highly relevant because the choice of weapons could indicate the defendant planned to kill the victim. The judge, who instructed the jury that there was no impropriety in the lawful possession of firearms, did not abuse his discretion in admitting this evidence. See *Commonwealth* v. *Hodge (No. 2)*, *supra*, quoting *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279, cert. denied, 371 U.S. 852 (1962). The judge should not have allowed the defendant's membership in a firearm-related group in evidence because it was not relevant. We conclude, however, that this evidence could not have substantially swayed the jury given the evidence of the defendant's license to carry firearms and status as a firearms instructor. The error does not warrant a new trial. See *Commonwealth* v. *Flebotte, supra*.

3. *Juror issue.* In the midst of jury deliberation, a juror asked to speak with the judge, stating he wanted to tell him about his dual citizenship status.[11] In the presence of counsel, the judge asked the juror pertinent information about his status as a United

---

[11]The judge noted that the juror did not check the first box on the form regarding citizenship, but that "a significant percentage of jurors who come before the court have not completed that box."

States citizen. The judge found that the juror, a Micmac who stated he has dual citizenship in Canada and the United States, who had lived in the United States since 1953, and who voted in United States elections, was a citizen.[12] Because systemic exclusion of jurors based on race or ethnicity presents constitutional issues, the judge did not wish to dismiss the juror on grounds of nationality or ethnicity. See generally *Powers* v. *Ohio*, 499 U.S. 400 (1991). The judge gave defense counsel an opportunity for further hearing on the issue.

The defendant argues that, even though the juror stated he had dual citizenship in the United States and Canada, the judge erred by not dismissing the juror.[13] The defendant claims that the juror's presence prejudiced him because a defendant is to be tried by a jury of peers who are fellow citizens.

General Laws c. 234A, § 74, which governs, inter alia, juror qualifications, challenges, and discharges, provides that "any defect in any procedure performed under this chapter shall not be sufficient to cause a mistrial or to set aside a verdict unless objection to such irregularity or defect has been made as soon as possible after its discovery or after it should have been discovered and unless the objecting party has been specially injured or prejudiced thereby." Even assuming the judge, who also found that the juror was impartial, erred when he did not excuse the juror, the defendant has not demonstrated that he was prejudiced. See *Commonwealth* v. *Garrey*, 436 Mass. 422, 431 (2002) ("verdict shall not be set aside based on irregularity in excusing juror under G. L. c. 234A unless objecting party has been prejudiced thereby"). In the circumstances here, where the judge conducted individual voir dire and later questioned the juror regarding his citizenship status, the judge was the person best able to gauge the juror's assertions. See *Commonwealth* v. *Sanders*, 451 Mass. 290, 307 (2008).

4. *Prosecutor's closing statement.* The defendant asserts, in

---

[12]The juror also stated that his citizenship was recognized in both countries, asserted that he did not have any immigration issues, and referenced the Jay Treaty, which he believed grants him dual citizenship. See 8 U.S.C. § 1359 (2006); *Akins* v. *Saxbe*, 380 F. Supp. 1210, 1214 (D. Me. 1974).

[13]The defendant also points to the Web site of the office of the jury commissioner that lists the disqualifications from juror service.

essence, that the prosecutor impermissibly suggested to the jurors that they must decide whether the law regarding heat of passion was no longer acceptable in 2010, when the trial took place.[14] There is no error.

"[P]rosecutors are entitled to marshal the evidence and suggest inferences that the jury may draw from it," *Commonwealth v. Drayton*, 386 Mass. 39, 52 (1982), and those inferences need only be reasonable and possible. *Commonwealth v. Casale*, 381 Mass. 167, 173 (1980). We presume the jury recognize the prosecutor's role as an advocate, see *Commonwealth v. Mitchell*, 428 Mass. 852, 857 (1999), and review the prosecutor's remarks "in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth v. Ortiz*, 463 Mass. 402, 415 (2012), quoting *Commonwealth v. Raposa*, 440 Mass. 684, 694 (2004).

Voluntary manslaughter based on heat of passion requires evidence that there was "provocation that would have been likely to produce in an ordinary person" such a state of mind as would overcome reflection or restraint and that the provocation "actually did produce such a state of mind in the defendant." *Commonwealth v. Sirois*, 437 Mass. 845, 854 (2002). See Model Jury Instructions on Homicide 64-67 (2013). "The jury must be able to infer that a 'reasonable person would have become sufficiently provoked and that, in fact, the defendant was provoked.' " *Commonwealth v. Burgess*, 450 Mass. 422, 438 (2008), quoting *Commonwealth v. Garabedian*, 399 Mass. 304, 313 (1987).

Here, the contested comments were that the victim's disclosure of infidelity was not the sort of provocation that would cause a reasonable adult male to lose his capacity for self-restraint because there were other options, such as telephoning a friend, sibling, or parent. See *Commonwealth v. Smith*, 460 Mass. 318, 325 (2011). The prosecutor's statement properly made the dis-

---

[14]The prosecutor stated, "And even if you believe that she blurted out in those moments . . . and suddenly decide[d] well, I think I'll just poke the bear right now and tell him. Is that reasonable provocation? Do you accept that? In 2010 that is reasonable provocation such that an adult male can lose his self-restraint and kill. Do you accept that? Because that's the first part of this analysis. Is it reasonable provocation for the reasonable person to have been sufficiently provoked?"

tinction between a killing committed with heat of passion, where the defendant was sufficiently provoked, and one committed with premeditation.

5. *Jury instructions.* The defendant requested an instruction that "sudden oral revelation of infidelity may be sufficient provocation to reduce murder to manslaughter." He contends that the judge's denial to instruct the jury in this manner was error. He also argues that the judge's instructions were contradictory and implicitly conveyed instructions that the fact learned in a sudden revelation of infidelity must be true. Additionally, he asserts that the defendant's multiple statements that his wife was cheating on him immediately after the killing provide sufficient evidence to entitle him to his proposed instruction on reasonable provocation and an instruction that the government must disprove mitigation beyond a reasonable doubt.

The judge used the Model Jury Instructions on Homicide.[15] See *Commonwealth* v. *Mercado*, 452 Mass. 662, 671 (2008). The judge was not required to adopt the defendant's proposed language, which would have credited the defendant's testimony that the victim's statements constituted a sudden revelation. Rather, the language of the Model Jury Instructions permits the jury to make that determination. There was ample evidence, including the defendant's testimony, that the idea of the victim's infidelity was not new to the defendant, and the instructions on provocation were proper. See *Commonwealth* v. *Ruiz*, 442 Mass. 826, 839-840 (2004); *Commonwealth* v. *Mercado, supra,* quoting *Commonwealth* v. *Andrade*, 422 Mass. 236, 237-238 (1996) ("revelation alleged to have precipitated the homicide must be a 'sudden discovery' ").

Although the defendant argues otherwise, the order of the charges, first defining murder and malice, and then defining how malice may be negated by mitigating circumstances, does

---

[15]The judge's instructions were nearly verbatim to the Model Jury Instructions on Homicide in effect at the time of the trial, including the instruction that "mere words, no matter how insulting or abusive, standing alone do not constitute reasonable provocation. However, the existence of sufficient provocation is not foreclosed because a defendant learns of a fact from a statement rather than from personal observation." We note that in March, 2013, a new edition of the Model Jury Instructions on Homicide was released. See *Commonwealth* v. *Alcequiecz*, 465 Mass. 557, 567 n.13 (2013).

not constitute error. See *Commonwealth* v. *Rivera*, 445 Mass. 119, 130-131 (2005) (proper to instruct on felony-murder before felony-murder in second degree). The judge instructed the jury on murder in the first degree, voluntary manslaughter, and heat of passion, in that order. Given the fact that the judge issued instructions that were nearly verbatim to the Model Jury Instructions, there was no error.[16]

Likewise, the record does not support the contention that these instructions are contradictory and convey implicit instructions that the fact learned in a sudden revelation of infidelity must be true. The judge properly instructed the jury that they "have an obligation to return a verdict of the highest degree of murder that the Commonwealth has proved beyond a reasonable doubt," an instruction which this court has approved. See *Commonwealth* v. *Pimental*, 454 Mass. 475, 484-485 (2009). Finally, the judge repeatedly instructed the jury on the presumption of innocence and the Commonwealth's burden of proof. There were no errors in the instructions to the jury.

6. *Relief pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record and see no reason to exercise our authority to reduce the jury's verdict or to order a new trial.

*Judgment affirmed.*

---

[16]The judge's instructions also included the following:

"If the Commonwealth proves each of these two elements [of an unlawful killing] beyond a reasonable doubt but has failed to prove the absence of heat of passion based on reasonable provocation, then you should return a verdict of guilty of manslaughter. If, however, the Commonwealth has failed to prove either of the two elements of voluntary manslaughter beyond a reasonable doubt, then you cannot find the defendant guilty of that crime and your verdict would be not guilty."

There is no burden-shifting language here, as the defendant suggests.