NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10709


COMMONWEALTH  vs.  DEREK WOOLLAM.



Bristol.     October 6, 2017. - December 13, 2017.

Present:  Gants, C.J., Gaziano, Budd, Cypher, & Kafker, JJ.


Homicide.  Constitutional Law, Grand jury, Assistance of
    counsel, Admissions and confessions, Voluntariness of
    statement.  Due Process of Law, Grand jury proceedings,
    Assistance of counsel.  Grand Jury.  Cellular Telephone.
    Evidence, Grand jury proceedings, Authentication, State of
    mind, Motive, Consciousness of guilt, Bias of government
    witness, Prior misconduct, Admissions and confessions,
    Voluntariness of statement.  Witness, Bias.  Practice,
    Criminal, Capital case, Grand jury proceedings, Assistance
    of counsel, Conduct of prosecutor, Admissions and
    confessions, Voluntariness of statement.




    Indictments found and returned in the Superior Court
Department on March 29, 2007, and April 17, 2008.

    A pretrial motion to suppress evidence was heard by Robert
J. Kane, J.; the cases were tried before Barbara A. Dortch-
Okara, J.; and a motion for a new trial, filed on May 29, 2013,
was heard by Renee P. Dupuis, J.


    David H. Mirsky (Joanne Petito also present) for the
defendant.
    Yul-mi Cho, Assistant District Attorney, for the
Commonwealth.

BUDD, J.  In February, 2009, a jury convicted the defendant, Derek Woollam, of murder in the first degree on a theory of deliberate premeditation in connection with the shooting death of John Oliveira in July, 2006.[1]  In this appeal, the defendant asserts error in the unauthorized presence of police officers in the grand jury room during the presentation of witness testimony in support of the indictments against him, as well as the admission of certain evidence at trial due to ineffective assistance of counsel and prosecutorial misconduct. He also seeks relief under G. L. c. 278, § 33E.  After full consideration of the record and the defendant's arguments, we affirm his convictions and the denial of his motion for a new trial, and we decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.

Background.  We summarize the evidence that the jury could have found, reserving certain details for discussion of specific issues.

1.  The drug operation.  In 2006, John Oliveira ran a large-scale drug operation out of a studio apartment in a duplex in Swansea.  At the time of his death, he had two "employees": the defendant, who delivered marijuana to customers and collected the money; and Dylan Hodgate, who broke down the

_____

[1] Derek Woollam was also convicted of trafficking in a controlled substance.

larger quantities of marijuana and repackaged them into smaller bags. Oliveira's girl friend lived in the other apartment in the duplex.

Oliveira had several rules in connection with his drug business, all designed to protect the operation and minimize detection. For instance, the exterior doors were always to be kept locked, no others could be brought to the house, and one of the four of them was always to be present at the house. Further, the defendant, the girl friend, and Hodgate were prohibited from being under the influence of drugs.

In January or February of 2006, Oliveira's girl friend discovered that the defendant was using drugs, and began procuring pills from him. The defendant and Oliveira's girl friend agreed not to tell Oliveira about their use of pills. Over the course of several months, the relationship between Oliveira and the defendant deteriorated. Oliveira complained to his girl friend that the defendant was "never on time," was "a slacker," and "wasn't doing what he was supposed to do."

2. The shooting. On July 4, 2006, Oliveira discovered a text message from his girl friend on the defendant's cellular telephone (cellphone) asking the defendant for pills. Oliveira was very upset and told the defendant, "You broke the rules." When the defendant lied and said that the pills were likely for the girl friend's cousin, Oliveira said that he would speak to

the girl friend that night and would "let [the defendant] know" after that.  Oliveira sent a text message to his girl friend to let her know that he was "pissed," and that he would be coming by the apartment to discuss the matter, warning her "not [to] lie."

Later that night, although Oliveira and his girl friend had seemingly resolved the matter, he was still angry with the defendant.  At approximately 12:15 A.M., Oliveira received a telephone call and told his girl friend that he was going to pick up Hodgate and would be right back.  He never returned.

The last call made from Oliveira's cellphone was to Hodgate's cellphone at 1:28 A.M.  At approximately 1:43 A.M., a Swansea police officer on routine patrol saw a black Mercury Sable (the make, model, and color of the defendant's automobile) pull out of the driveway of the house with two people inside.

The next morning, Oliveira's girl friend saw Oliveira's automobile in the driveway.  The interior door to the studio apartment was locked, and there was no answer when she knocked.  This was unusual because Hodgate was normally supposed to be there during the day.  She was unable to reach Oliveira, the defendant, or Hodgate by telephone despite many attempts over the course of the day.  When she returned later that afternoon, Oliveira's automobile was in the same spot.  When she knocked on the studio apartment door, there was still no answer, and she

noticed that the television inside was abnormally loud. Eventually, she discovered that the exterior back door to the studio apartment was unlocked. When she entered, she found Oliveira's body lying in a pool of blood. He had been shot several times and was cold to the touch.

An autopsy revealed that Oliveira had been shot four times. Two shots to the head were fatal: one bullet entered through the left cheek, and a second entered through the right forehead. The location and path of a third bullet, which entered the lower right side of his torso, was consistent with Oliveira having been shot while lying on his back. The fourth bullet grazed the back of his head.

3. The aftermath. Soon after Oliveira's girl friend discovered the body, the defendant arrived. Before the police were called, the defendant removed marijuana in large duffel bags from the studio apartment and left with them in his black four-door automobile.

Over the next few days, the defendant enlisted help from others to distribute the marijuana that came from the studio apartment, and to clear out a storage locker in his name containing guns and ammunition. He also removed the batteries and subscriber identity module (SIM) cards from his cellphones to avoid being tracked. He admitted to one of the people who assisted him, Michael Pacheco, that he killed the victim because

he believed that the victim was going to kill him after learning about the pills, and that Oliveira suspected that the defendant was having an affair with Oliveira's girl friend. One to two weeks later, the defendant and Pacheco went together to burn a bag containing the sneakers and clothes from the night of the shooting.

4. The defendant's case. The defendant, who testified at trial, denied killing the victim. He also attacked the credibility of the Commonwealth's witnesses and cast doubt on the thoroughness of the police investigation, as well as the conclusiveness of the physical evidence, noting that the Commonwealth did not produce incriminating fingerprint or deoxyribonucleic acid evidence. Finally, he also raised the possibility of a third-party culprit, which included Hodgate, Mexican drug dealers, and a tall, white male who hung around a local bar.

Discussion. The issues that the defendant raises in his direct appeal are the same ones he raised in his motion for a new trial. He argues that the presence of investigating police officers in the grand jury room during witness testimony resulted in structural error requiring the reversal of his convictions, and that it was ineffective assistance for his counsel to fail to move to dismiss the indictments. He further claims ineffective assistance in trial counsel's failure to

object to the admission of certain cellphone record evidence, failure to object to the admission of evidence of his bad character, and failure to rebut the false testimony of a cooperating witness.[2]  Finally, the defendant claims that the admission of statements he made during an interview with police violated his Miranda rights.  We examine each claim in turn.

1.  Unauthorized police presence in the grand jury room. During the Commonwealth's presentation to the grand jury in support of indictments against the defendant, one or both of two police officers involved in the investigation were present in the grand jury room for most, if not all, of the witnesses' testimony.  The defendant contends that the error, conceded by the Commonwealth, requires not only the vacatur of his convictions but also the dismissal of the indictments under the United States Constitution and the Massachusetts Declaration of Rights.

The presence of an unauthorized person before a grand jury will void an indictment where a defendant challenges that indictment prior to trial.  See Commonwealth v. Holley, 476 Mass. 114, 119 (2016); Commonwealth v. Pezzano, 387 Mass. 69, 70, 72-73, 76 (1982).  However, where, as here, the defendant failed to raise the issue until after he was convicted, the

_____

[2] The defendant additionally claims that it was prosecutorial misconduct for the prosecutor to allow the cooperating witness to testify falsely.

indictments will be voided only where he can show that the "grand jury irregularity caused a substantial likelihood of a miscarriage of justice in the trial jury's verdict[s]." Holley, supra at 119-120.

Here, as in Holley, the defendant has not demonstrated that the presence of unauthorized parties in the grand jury room led to a substantial likelihood of a miscarriage of justice. Id. at 120. He has not alleged that the presence of the police officers caused grand jury witnesses to feel "coerced or intimidated." Id. Many of the witnesses before the grand jury were also witnesses at trial, where they were subject to the defendant's cross-examination, and none of the grand jury testimony was admitted substantively at trial. Finally, the petit jury convicted the defendant based on the standard of beyond a reasonable doubt -- a much more stringent standard than the probable cause standard required for an indictment. See United States v. Mechanik, 475 U.S. 66, 67 (1986). Assuming that it was error for the defendant's counsel not to challenge the indictments by way of a motion to dismiss, his claim for ineffective assistance of counsel on this aspect of his appeal must also fail because he failed to demonstrate a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014) (under § 33E review, ineffective assistance of counsel claim is

reviewed under substantial likelihood of miscarriage of justice standard).

2. Cellphone records. The defendant claims that his trial counsel was ineffective for failing to object to the admission of a variety of cellphone records, including records of call metadata,[3] text messages, and a summary chart. The defendant cannot show that his counsel's failure to object led to a substantial likelihood of a miscarriage of justice because the records were admissible. See Wright, 411 Mass. at 681-682.

First, the cellphone call logs were introduced at trial to show that the defendant did not make calls to the victim after his death. These call logs constitute computer-generated records. See Commonwealth v. Thissell, 457 Mass. 191, 197 n.13 (2010) (differentiating between "computer-generated records," which are generated solely by electrical or mechanical operation of computer, and "computer-stored records," which are generated by humans and contain statements implicating hearsay rule). As a matter of evidence law, the computer-generated records at issue here do not contain a statement from a person, and therefore, they do not raise hearsay concerns. See id.; Mass. G. Evid. § 801(a) (2017) (defining "[s]tatement" as "a person's

---

[3] "Metadata" refers to information about telephone calls other than the actual content of the calls, such as the numbers of the callers and the times and dates of calls placed and received.

oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion").  Accordingly, there was no legal basis to object to the call logs on hearsay grounds.

Given that the call logs at issue do not present hearsay concerns, their admissibility depends on whether those records were properly authenticated.  See Mass. G. Evid. § 901(a) (2017) ("[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is").  See also Thissell, 457 Mass. at 197 n.13 (reliability concerns are resolved by "authentication of the generative process that created the records").  An objection to the authentication of these records, however, would have been futile at trial, as it simply would have caused the Commonwealth to call witnesses who would have been able to authenticate them. See Commonwealth v. Housen, 458 Mass. 702, 712 (2011).

Second, the text messages, which were offered to show proof of motive for the killing, were admissible under the state of mind exception to the hearsay rule, which "calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when . . . there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it." Commonwealth v. Tassinari, 466 Mass. 340, 347 (2013), quoting

Commonwealth v. Qualls, 425 Mass. 163, 167 (1997), S.C., 440 Mass. 576 (2003). In this case, text messages from Oliveira to his girl friend indicated his anger upon learning about her request for pills from the defendant.[4] Because there was evidence that the defendant was aware that Oliveira was angry that he apparently was supplying pills to Oliveira's girl friend, Oliveira's state of mind was relevant. See Tassinari, supra, quoting Qualls, supra. Here, too, there was no viable authentication argument to be made, because a State police trooper testified to how he had extracted the messages from Oliveira's girl friend's cellphone. Thus, it was not error for trial counsel to fail to object to the text messages.

Finally, the summary chart was admissible as an accurate compilation of underlying records that had been admitted in evidence. See Commonwealth v. Carnes, 457 Mass. 812, 825 (2010). As we explained supra, each of the exhibits from which the summary chart was created was properly admitted. A hearsay objection would have been unavailing.

3. Character evidence. The defendant argues that his trial counsel was ineffective for failing to object to improper "bad character" evidence presented via Oliveira's girl friend,

---

[4] The messages stated in part: "I will be by later. Make sure you dont leave cause i have to talk to you. And i want you to answer my questions truthfully"; "Do not lie to me when we talk"; and "I am pissed."

who testified about the change in the defendant's demeanor when he was abusing pills:

> Q.:  "Now, did you notice some change in [the defendant's] behavior in the months prior to John Oliveira's death?"
>
> . . .
>
> A.:  "He seemed to have a different demeanor.  I always knew Derek as being very laid back, very friendly, very polite, very respectful.  After a little while of him using I noticed he seemed to be a little more aggressive, not as laid-back as he used to be.  He wouldn't keep up with himself like he used to, he used to always look nice, kind of almost let himself go, for lack of better words.  So it was definitely a change in his demeanor and appearance."
>
> Q.:  "Okay.  And what about in his behavior?"
>
> A.:  "Yes, he had become more aggressive, a little more violent.  He just -- he just -- he wasn't Derek, he wasn't the Derek I had met."

The defendant claims that trial counsel should have objected to the testimony that he became "more aggressive, a little more violent," and "wasn't the Derek [she] had met."

"It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose."  Commonwealth v. Helfant, 398 Mass. 214, 224 (1986), and cases cited.  See also Mass. G. Evid. § 404(b) (2010).  Such evidence may be admissible, however, to show, for example, "a common scheme, pattern of operation, absence of accident or mistake, identity,

intent, or motive."  Helfant, supra.

The Commonwealth argues that the testimony regarding the changes in the defendant once he began using drugs helped to demonstrate his motive for the killing.[5]  Upon review, we conclude that the point that the defendant's appearance and demeanor deteriorated over time was amply made without the additional testimony that he had become "a little more violent," which, while relevant, was more prejudicial than probative.[6]  See Commonwealth v. Montrond, 477 Mass. 127, 136-137 (2017).  Nevertheless, we conclude that there was no substantial likelihood of a miscarriage of justice because we are "substantially confident" that defense counsel's failure to object did not "alter the jury's verdict," given the considerable evidence of the defendant's guilt, as detailed below. See id. at 137, quoting Commonwealth v. Alcide, 472 Mass. 150, 157 (2015).

a.  Motive.  The Commonwealth presented evidence that by the time Oliveira was killed, the relationship between Oliveira and the defendant had soured considerably.  Oliveira, who was already unhappy with the defendant's work habits, learned that

---

[5] The testimony about the defendant's change in appearance and demeanor once he started to abuse pills provided a potential explanation for why his drug dealing performance slipped and the corresponding deterioration of his relationship with Oliveira.

[6] We see nothing wrong with the testimony that the defendant was "more aggressive" and "wasn't the Derek [she] had met."

the defendant was giving Oliveira's girl friend pills. The defendant knew that breaking this rule crossed a line and could cause him to lose his position in the drug dealing operation or worse. Oliveira's girl friend testified that the defendant told her that, if Oliveira ever found out that the defendant was using drugs, Oliveira would "kill" him. The defendant himself testified that he and Oliveira argued in the early evening of July 4 about the pills, and again later that night before Oliveira was killed. The Commonwealth posited that the defendant killed Oliveira because he wanted to avoid losing his position or other negative consequences, and because he was tired of following Oliveira's rules. The defendant's feelings were laid bare when, upon telling one witness that Oliveira was dead, he told her that he hoped Oliveira would "rot[] in hell."

b. Opportunity and means. The jury also could have found that the defendant had both the opportunity and the means to commit the crime. Oliveira was shot and killed in the studio apartment, and there were no signs of a break-in. Only three people had keys to that apartment where the marijuana was kept: Oliveira, the defendant, and Hodgate. The location of the studio apartment, which was used as a stash house, was secret. No one was allowed to be there except the three above-mentioned

men and Oliveira's girl friend.[7]

The defendant told a witness that he was at the studio apartment arguing with Oliveira sometime between midnight and 1 A.M. on July 5.  His automobile was seen leaving the premises at 1:43 A.M.  When Oliveira's girl friend attempted to enter the studio apartment from the common hallway of the duplex the next morning, she found it locked, despite the fact that the interior door was usually left unlocked.  A witness who owned the business next door to the duplex observed a black four-door automobile parked in the driveway for a few minutes at approximately 1 P.M.  When Oliveira's girl friend returned later in the afternoon, the volume on the television inside the studio apartment was turned up unusually high, and, while the interior door was still locked, the exterior door to the studio apartment had been left unlocked, which was unusual given the rules about securing the stash house location.

Finally, there was evidence that the defendant had access to firearms.  He asked one acquaintance to remove the firearms from a storage unit in his name.  The defendant told an acquaintance that he owned two nine millimeter firearms.

---

[7] Although the defendant pressed the theory of a third-party culprit throughout the trial, the odds of a third-party culprit other than Hodgate knowing about the location of, and being able to access, the studio apartment to shoot Oliveira are negligible.  Hodgate was tried and acquitted of the killing in 2011.

Investigators recovered from the scene of the shooting nine millimeter bullet casings and both a bullet and two casings from a .22 caliber handgun.

c. Consciousness of guilt. The Commonwealth also presented evidence to show the defendant's consciousness of guilt.

The defendant's behavior indicated that he knew that Oliveira was dead well before he claimed to have discovered the body. The defendant testified that he discovered Oliveira's body at approximately 3:15 P.M. on July 5. Despite this, the defendant did not attempt to telephone Oliveira after 1:28 A.M., even after Oliveira's brother telephoned the defendant looking for Oliveira. Nor did the defendant answer calls from Oliveira's girl friend that day.

Once Oliveira's body was discovered, the defendant's primary concern was moving the marijuana and firearms and disabling his telephones so that he could not be located.

Finally, the defendant told different stories to different parties in the aftermath of the shooting, including, but not limited to, telling Oliveira's girl friend that he did not know what happened and telling another associate that he and Oliveira got into an altercation with two men at a club in Providence, Rhode Island, in which shots were fired, and that Oliveira never

came home.[8]

   d.  The admission of guilt and other incriminating

evidence.  Perhaps the strongest evidence of the defendant's

guilt was Pacheco's corroborated testimony that the defendant

confessed to the killing.  The defendant told Pacheco that he

shot Oliveira in the head, and again in the chest because

Oliveira would not die.  This account was corroborated by the

testimony of the medical examiner who testified that (1)

Oliveira was shot both in the head and in the torso; (2) the

shot in the torso was consistent with Oliveira lying on his back

at the time; and (3) when a person is shot in the head, he or

she would lose consciousness but might have involuntary movement

of the extremities, consistent with the defendant's account of

how the victim "wouldn't die."

   Further, Pacheco's testimony that the defendant burned

items he wore on the night of the shooting was corroborated by

the fact that, months later, investigators found the burned

remains of sneakers and a zipper fly and, separately, a

weathered gasoline can in the areas indicated by Pacheco.

   In addition, the defendant knew or appeared to know

information that only one who was present during the shooting

would know.  This included the fact that Oliveira was shot in

---

   [8] Although clearly not dispositive, the defendant did not
attend either Oliveira's wake or funeral despite claiming
Oliveira was his "best friend."

the back of the head, which was a detail that the medical examiner was able to ascertain only upon shaving Oliveira's head in preparation for the autopsy. The defendant also indicated to two people that he thought that two different types of firearms were used in the shooting, including a nine millimeter and a higher-powered firearm, based on the size of the bullet holes. The medical examiner was not able to conclude that two different caliber firearms were used merely by examining the body; however, he recovered a small caliber projectile consistent with a bullet from a .22 caliber firearm from Oliveira's head, and two projectiles consistent with a nine millimeter firearm from underneath and beside Oliveira's body.

Given the significant evidence of guilt, we conclude that the admission in evidence of the testimony of Oliveira's girl friend that the defendant had become "a little more violent" did not cause a substantial likelihood of a miscarriage of justice.[9] See Wright, 411 Mass. at 682.

4. Cooperating witness testimony. One of the Commonwealth's witnesses, Pacheco, testified that the defendant admitted to shooting Oliveira. During cross-examination,

_____

[9] The prosecutor repeated the "bad character" testimony in his closing argument by stating that the defendant had "become violent." However, the prosecutor did not argue that the defendant killed Oliveira because he had become violent. Instead, he raised it in connection with the defendant's motive. It was by no means a principal point of his argument, and he did not dwell on it.

Pacheco testified that he had pleaded guilty to thirteen criminal charges when, in fact, all but one had been dismissed or placed on file, and the remaining one had been continued without a finding.  The defendant blames both his counsel and the prosecutor for this error, and argues that ineffective assistance and prosecutorial misconduct in failing to correct the record cost him a fair trial.  We review both aspects of the defendant's claim for a substantial likelihood of a miscarriage of justice, Commonwealth v. Burgos, 462 Mass. 53, 60, cert. denied, 568 U.S. 1072 (2012), and we find no such substantial likelihood.

A criminal defendant has a right "to reasonable cross-examination of a witness for the purpose of showing bias, particularly where that witness may have a motivation to seek favor with the government."  Commonwealth v. Haywood, 377 Mass. 755, 760 (1979), quoting Commonwealth v. Dougan, 377 Mass. 303, 310 (1979).  Here, the defendant received the benefit of a thorough cross-examination of Pacheco.

First, it is important to note that there was no quid pro quo agreement involving open cases.[10]  The consideration Pacheco

---

[10] After Pacheco's grand jury testimony, the Commonwealth relocated him to an undisclosed address and paid his rent for a period of time as a result of a credible threat in connection with his cooperation in this case.  In exchange for the relocation benefits, Pacheco agreed that, if called, he would testify truthfully at any future hearings or trial.

received on his then-open criminal cases was in exchange for his testimony in an unrelated drug case. On cross-examination, the defendant's trial counsel outlined each of Pacheco's thirteen charges and elicited from Pacheco that he was guilty of each one. The fact that Pacheco mistakenly testified that he pleaded guilty rather than having all but one of the charges dismissed or placed on file was unlikely materially to affect the jury's evaluation whether he had reason "to seek favor with the government." See Haywood, 377 Mass. at 760. Trial counsel made the point that Pacheco received two years of probation in exchange for information he provided to police on an unrelated case. There was no substantial likelihood of a miscarriage of justice. See Commonwealth v. Fisher, 433 Mass. 340, 357 (2001) ("absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion").

Nor was there prosecutorial misconduct. This was not a situation in which the prosecution allowed a witness to lie outright, or withheld information about an arrangement from the defense. See Burgos, 462 Mass. at 62. Instead, there was an extensive discussion at sidebar regarding Pacheco's criminal record and arrangements with the Commonwealth. As discussed above, the jury were made aware of both. "Any equivocation

. . . concerning the terms of [the] cooperation agreement appeared to reflect the witness's uncertainty regarding the exact contours of the consideration he would receive."  Id. at 63.  Because the jury were aware that Pacheco was receiving favorable treatment from the Commonwealth, there was no substantial likelihood of a miscarriage of justice.

5.  Statements to law enforcement.  The defendant claims statements he made during an interview with law enforcement were improperly admitted at trial, violating his rights under the Fifth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.

A defendant's exercise of his or her constitutional right to the assistance of counsel imposes on the police a duty to ensure that the defendant's right "to cut off questioning [is] scrupulously honored."  Commonwealth v. Torres, 424 Mass. 792, 795-796 (1997).  However, this duty only pertains to custodial interrogations.  Commonwealth v. Groome, 435 Mass. 201, 215-216 (2001).  The motion judge ruled that the defendant was not in custody during the police interview and thus denied the defendant's motion to suppress the statements he made to police. "'When reviewing the denial of a motion to suppress, we accept the [motion] judge's findings of fact . . . absent clear error,' but we independently determine 'the correctness of the judge's

application of constitutional principles to the facts as found.'" Commonwealth v. Molina, 467 Mass. 65, 72 (2014), quoting Commonwealth v. Tremblay, 460 Mass. 199, 205 (2011).

We summarize the facts as the motion judge found them. Two days after Oliveira's death, after consultation with his attorney, the defendant voluntarily went to the Swansea police station to be interviewed by a Swansea police detective and police officer and a State police trooper. At the beginning of the interview, the detective, who conducted the questioning, informed the defendant of his Miranda rights, which he indicated that he understood. The defendant told the investigators that he would talk about "[s]ome things . . . but not everything." In response, the detective told him that he could refuse to answer any question. During the interview, which lasted for approximately forty-five minutes, the detective spoke in a calm and even manner. The defendant exhibited neither distress nor excitement. At one point the defendant told the detective that he trusted the detective "100 percent." The defendant answered some open-ended questions, and indicated that he wanted his lawyer present for others. At a couple of points during the interview, the defendant invoked the Fifth Amendment, but continued to speak voluntarily with the investigators. The questioning stopped when the defendant stated, "Before we go any further, I would like my lawyer present." The defendant was not

arrested and was free to leave at the end of the interview.

A person is in custody whenever he is "deprived of his freedom of action in any significant way" (citation omitted). Groome, 435 Mass. at 211. "The determination of custody depends primarily on the objective circumstances of the interrogation," Commonwealth v. Sneed, 440 Mass. 216, 220 (2003), that is, "whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody." id., quoting Commonwealth v. Brum, 438 Mass. 103, 111 (2002). In assessing the circumstances, we consider the following factors:

> "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."

Groome, supra at 211-212.

Here, three of the four factors militate in favor of the defendant not being subjected to a custodial interrogation. Throughout the interview, which was investigatory rather than accusatory, the officers did not suggest to the defendant that he was a suspect. The officers did not tell him that the police had any incriminating evidence against him, or even that he was

under suspicion. See Brum, 438 Mass. at 112. The interview was informal: the defendant arrived voluntarily, and during the course of the relatively short interview, both he and the detective spoke in calm, even tones. Sneed, 440 Mass. at 221. Further, the defendant controlled the parameters of the interview, indicating which questions he would answer and which he would not. See Groome, 435 Mass. at 213. Finally, the questioning ended when the detective stated, "Before we go any further, I would like my lawyer present." He then freely left the interview, as opposed to being arrested. See Sneed, supra at 220; Brum, supra.

Although the interview took place at the police station, a location that could be considered coercive, Commonwealth v. Bookman, 386 Mass. 657, 660 (1982), given the above, this factor is not dispositive. Commonwealth v. Sparks, 433 Mass. 654, 657 (2001). See Brum, 438 Mass. at 112.

We agree with the motion judge that the defendant was not in custody during the questioning, and thus, the question whether the investigators scrupulously honored his invocation of his right to counsel goes to voluntariness, an issue which the defendant waived at trial and did not attempt to resurrect in his motion for a new trial or his appeal.[11] At any rate, in

---

[11] Regardless of whether an individual is determined to have been in custody, his or her statements must have been made

reviewing the totality of the circumstances, we agree with the motion judge's assessment that the defendant's statements were voluntary.  See Commonwealth v. Mandile, 397 Mass. 410, 413 (1986).

6.  Review under G. L. c. 278, § 33E.  We have reviewed the briefs and the entire record and discern no reason to reduce the degree of guilt or grant a new trial pursuant to our powers under G. L. c. 278, § 33E.

Judgment affirmed.

Order denying motion for a
    new trial affirmed.

---

voluntarily to be admissible.  Commonwealth v. Brady, 380 Mass. 44, 48 (1980).  "A statement is voluntary if it is the product of a 'rational intellect' and a 'free will,' and not induced by physical or psychological coercion."  Commonwealth v. LeBlanc, 433 Mass. 549, 554 (2001).