UNITED STATES of America,
Plaintiff,

v.

Joseph Granson PRITCHARD and
Ronnie Joseph Johnson,
Defendants.

Case No. SACR 08–00267–CJC.

United States District Court,
C.D. California,
Southern Division.

Jan. 30, 2014.

Michael Anthony Brown, Joseph Timothy McNally, AUSA, Office of U.S. Attorney, Santa Ana, CA, for Plaintiff.

Kenneth A. Reed, Kenneth A. Reed Law Offices, Santa Ana, CA, Timothy Allen Scott, Timothy Allen Scott Law Offices, San Diego, CA, for the Defendants.

## ORDER DENYING DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE STATISTICAL ANALYSES IN DNA EXPERT TESTIMONY

CORMAC J. CARNEY, District Judge.

## I. INTRODUCTION

Defendants Joseph Pritchard and Ronnie Johnson (together, "Defendants") are charged with conspiracy to commit bank robbery, armed bank robbery, and using a firearm during and in relation to a crime of violence. This motion *in limine* concerns the admissibility of key evidence—DNA evidence—connecting Defendants to the robbery. The Government's DNA expert, Jeanne Putinier, performed a series of DNA tests on samples taken from a ski mask, a pistol, and a Superman baseball hat found in a getaway car used by the bank robbers, as well as from the interior surface of the getaway car's windshield, and concluded that some DNA samples were consistent with Defendants' DNA profiles. Ms. Putinier also performed statistical analysis to determine the probability of a coincidental match for each DNA sample.

Mr. Johnson, later joined by Mr. Pritchard, filed a motion *in limine* to exclude Ms. Putinier's statistical analysis testimony. (*See* Dkt. No. 286 ["Mot. *In Limine* "] at 4–10.) In particular, Defendants raise three objections. First, Defendants argue that Ms. Putinier's statistical analysis testimony is inadmissible under Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Second, Defendants contend that, to the extent it relies on external sources such as published databases of population frequencies for a core set of genetic markers, Ms. Putinier's statistical analysis testimony would violate their rights under the Confrontation Clause. And third, Defendants argue that Ms. Putinier's statistical analysis testimony should be excluded under Rule 403 because "such testimony easily devolves into the 'prosecutor's fallacy.'" (Mot. *In Limine* at 9.) [1]

At a pretrial conference held on January 14, 2014, the Court preliminarily denied Defendants' motion to exclude Ms. Putinier's statistical analysis testimony and declined to hold a *Daubert* hearing. On reconsideration, however, the Court decided to grant Defendants' request for a *Daubert* hearing. A *Daubert* hearing was held on January 24, 2014, at which Ms. Putinier

---

1. Defendants do not challenge the admissibility of Ms. Putinier's expert testimony concerning the DNA tests or her conclusion that some of the tested DNA samples were consistent with Defendants' respective DNA profiles. (*See* Mot. *In Limine* at 4 ("The government should not be permitted to *augment* its DNA evidence with misleading and unqualified testimony in the field of statistics." (emphasis added)); Pretrial Conference Tr. at 9:13–16, Jan. 14, 2014 (Brown) ("This isn't a motion to exclude DNA wholesale or to talk about whether there was a match or things, but I'm specifically talk [*sic* ] about the Government's witness as a statistician.").) The Court therefore only addresses whether Ms. Putinier's statistical analysis testimony is admissible.

testified regarding her qualifications to provide statistical analysis testimony, as well as regarding the reliability of her methodology for calculating population frequency estimates. Having considered the briefs submitted by the parties and the testimony and evidence presented at the *Daubert* hearing, the Court affirms its preliminary finding that Ms. Putinier's proposed testimony is admissible. Defendants' motion to exclude Ms. Putinier's statistical analysis testimony is DENIED.

## II. BACKGROUND

On the morning of January 22, 2008, three men wearing black ski masks and gloves robbed the Downey Savings and Loan on 17th Street in Costa Mesa. One of the robbers pointed a gun to the bank tellers' heads and threatened to kill them if they did not follow his instructions. He commanded the bank tellers to provide money to the robbers and he then forced the employees into the bank's vault where the robbers took more money. The bank robbers stole over $120,000.

After completing the heist, the robbers fled to a car, where an associate was waiting for them. The four then drove a few blocks from the bank, ditched the car, and got into a Toyota Sequoia driven by a second accomplice. The police soon identified the Sequoia as the getaway car and began pursuit. A 45–mile high-speed chase ensued, in which the Costa Mesa Police Department, the California Highway Patrol, the Los Angeles Police Department, and their various helicopters pursued the Sequoia from Orange County to Los Angeles County. The chase ended when the Sequoia crashed into a tree at a shopping mall in Los Angeles. When the Sequoia crashed, the robber sitting in the front passenger seat hit his head on the front windshield, causing the windshield to crack.

After the crash, the driver, later *identified* as Anthony Casio, did not exit the vehicle and was arrested on site. The remaining four men ran. California Highway Patrol officers arrested one of the fleeing robbers, later identified as Demetrick Smart, but the other three escaped. Mr. Smart subsequently identified Marvin Sanders and the two Defendants as the three robbers who had successfully fled. After the FBI arrested Mr. Sanders, he too identified the two Defendants here as his fellow bank robbers. A crime scene investigator collected evidence at the scene of the crash, including stolen cash and a bag used to carry it; hats, gloves and ski masks left behind by the robbers; and a 9mm semiautomatic pistol loaded with hollow point bullets. The investigator also swabbed the car's interior surfaces for DNA samples. All of the collected evidence was then sent for processing to the Orange County Crime Lab for DNA analysis.

The Government asserts that it found DNA samples tying Defendants to the bank robbery on a Superman baseball hat, a ski mask, the 9mm pistol, and the interior surface of the Sequoia's windshield. These samples were analyzed by Jeanne Putinier, a forensic analyst for the Orange County Crime Lab and the Government's proposed DNA expert witness at trial. Ms. Putinier concluded that the DNA mixture obtained from the Superman baseball hat and the slide of the 9mm pistol matched Mr. Johnson's DNA profile. (*See* Dkt. No. 337–7 ["Jan. 21, 2014 DNA Report"] at 1 (Superman baseball hat); Dkt. No. 337–6 ["Aug. 7, 2013 DNA Report"] at 1 (pistol slide).) She also concluded that DNA samples obtained from the ski mask and the Sequoia's windshield matched Mr. Pritchard's DNA profile. (*See* Dkt. No. 337–4 ["Oct. 5, 2009 DNA Report"] at 1 (ski mask); Dkt. No. 337–5 ["Feb. 28, 2010

DNA Report"] at 1 (windshield interior).) Ms. Putinier further determined that the probability of a coincidental match—that is, the frequency of choosing another person at random who could not be excluded as a contributor to the various DNA samples—is less than 1 in 600,000 for the baseball hat sample, less than 1 in 1 trillion for the ski mask sample, less than 1 in 1 billion for the pistol slide sample, and less than 1 in 1 trillion for the Sequoia windshield interior sample. (*See* Jan. 21, 2014 DNA Report at 1; Oct. 5, 2009 DNA Report at 1; Aug. 7, 2013 DNA Report at 1; Feb. 28, 2010 DNA Report at 1.)

The Government seeks to offer these population frequency estimates at trial. Defendants move to exclude Ms. Putinier's population frequency estimates because, they contend, she is unqualified to provide statistical analysis testimony and the testimony is based on unreliable methodology. Defendants also move to exclude the population frequency estimates to the extent they are based on external sources and would thus violate their rights under the Confrontation Clause. Finally, Defendants move to exclude the population frequency estimates because they contend that the probative value of such estimates is outweighed by the estimates' prejudicial effect.

## III. ANALYSIS

### A. Motion to Exclude Under Rule 702

■ Before allowing the jury to hear expert testimony, a district court must carry out its gatekeeping role to determine that the expert is testimony is admissible under Federal Rule of Civil Procedure 702. *See Estate of Barabin v. AstenJohnson, Inc.,* 740 F.3d 457, 464–65 (9th Cir.2014) (en banc). An expert witness may testify at trial if the expert's "specialized knowledge will help the trier of fact to under-stand the evidence or to determine a fact in issue." Fed.R.Evid. 702(a). A witness must be "qualified as an expert by knowledge, skill, experience, training, or education" and may testify if (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R.Evid. 702(b-d); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 148–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Expert testimony is liberally admitted under the Federal Rules. *See Daubert,* 509 U.S. at 588, 113 S.Ct. 2786 (noting that Rule 702 is part of the "liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony"); *see also* Fed.R.Evid. 702 Advisory Committee Notes to 2000 Amendments ("[R]ejection of expert testimony is the exception rather than the rule.").

■ The Ninth Circuit has interpreted Rule 702 to require that "expert testimony be both relevant and reliable." *Barabin,* 740 F.3d at 463 (internal quotation marks and alterations omitted). "Relevancy simply requires that '[t]he evidence . . . logically advance a material aspect of the party's case.'" *Id.* (alterations in original) (quoting *Cooper v. Brown,* 510 F.3d 870, 942 (9th Cir.2007)). As to reliability, the district court must determine whether an expert's testimony has "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire,* 526 U.S. at 149, 119 S.Ct. 1167 (internal quotation marks and alterations omitted). "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786; *see also Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir.2010).

In *Daubert* and *Kumho Tire,* the Supreme Court identified the following factors a court should use to determine whether the methods and principles employed by an expert are reliable: (1) whether the method "can be (and has been) tested;" (2) whether the method "has been subjected to peer review and publication;" (3) the method's "known or potential rate of error;" (4) whether there are "standards controlling the technique's operation;" and (5) whether the method has "general acceptance" within the "relevant scientific community." *Daubert,* 509 U.S. at 592–94, 113 S.Ct. 2786; *accord Kumho Tire,* 526 U.S. at 149–50, 119 S.Ct. 1167. These factors are not exhaustive, and the Supreme Court has emphasized that the reliability inquiry is "a flexible one." *Kumho Tire,* 526 U.S. at 149–50, 119 S.Ct. 1167. Moreover, while pretrial *Daubert* hearings are commonly used, they are certainly not required. *See Barabin,* 740 F.3d at 463–64.

Defendants contend that the Government has not shown that Ms. Putinier is qualified to offer opinions on statistics and that the Government has not revealed Ms. Putinier's methodology or established that her methodology is reliable under the *Daubert* factors. The Court has held a *Daubert* hearing and has conducted its own review of the *Daubert* factors. As discussed below, each of these factors points in favor of permitting admission of Ms. Putinier's population frequency estimates.

### 1. Expert Qualification

Defendants first dispute Ms. Putinier's qualifications to provide statistical analysis testimony. Ms. Putinier is a Forensic Scientist III for the Orange County Crime Lab (the "OC Crime Lab"), a division of the Orange County Sheriff–Coroner Department. (*See* Mot. *In Limine* Ex. A ["Putinier Test. Excerpts"]; Mot. *In Limine* Ex. D ["Putinier Curriculum Vitae"] at 1.) She has been employed by the OC Crime Lab's DNA Section for thirteen years, where her responsibilities include generating population frequency statistics. (Putinier Curriculum Vitae at 1.) She received a Bachelor's of Science in Zoology from California State Polytechnic University in Pomona, a Master of Science in Biology from San Diego State University, and a Master of Science in Criminalistics from California State University, Los Angeles. (*Id.*) Her formal education included the study of DNA forensic analysis. (*Daubert* Hr'g Tr. at 7:11–14, Jan. 24, 2014 (Putinier).) In her career, she has performed DNA extractions, amplifications, and analyses numbering in the thousands. (Putinier Test. Excerpts at 210:13–18.) As part of those analyses, Ms. Putinier generates population frequency statistics. (*Id.* at 214:19–22.) She has also been qualified as a DNA expert at least 50 times in multiple courts. (*Daubert* Hr'g Tr. at 10:12–21.) Her testimony on those occasions involved opinions about population frequency statistics. (*Id.* at 10:22–24, 18:7–12.)

Ms. Putinier has received special training in statistics as it applies to DNA analysis. This training includes "Statistics in DNA Analysis," a 16–hour class given by the California Criminalistics Institute (2001); "Basic Principles in Statistics," an eight-hour class she attended at the 14th International Symposium on Human Identification (2003); and "Population Statistics and Forensic DNA Analysis," a twenty-four hour class given by the OC Crime Lab (2007). (Putinier Curriculum Vitae at 2.) Additionally, as part of her continuing education while working for the OC Crime Lab, she has taken a course from the FBI Academy on Short Tandem Repeat Analysis by Capillary Electrophoresis, as well as several classes on DNA mixture interpre-

tation and population frequency estimation. (*Daubert* Hr'g Tr. at 8:11–23.)

In addition to her training, Ms. Putinier has also coauthored an article in the Journal of Forensic Science regarding the OC Crime Lab's validation of two of the DNA typing systems that were previously used at the laboratory. (*Id.* at 8:24–9:12.) Further, she is a member of the California Association of Criminalists and the American Academy of Forensic Sciences. (*Id.* at 9:13–15.) The OC Crime Lab is accredited by the Laboratory Accreditation Board of the American Society of Crime Laboratory Directors. (*Id.* at 9:16–21.) The OC Crime Lab also meets standards and follows guidelines necessary to contribute to the FBI's CODIS database, the index used to generate population frequency estimates in this case. (*Id.* at 9:22–10:11.)

The Court finds that Ms. Putinier's education and training, specialized knowledge of DNA evidence, and experience as a forensic analyst for over thirteen years, taken together, render her well qualified to provide expert testimony on population frequency statistics. Defendants contend that Ms. Putinier is not qualified because "attending three classes does not make one a statistician." (Pretrial Conference Tr. at 11:4–5, Jan. 14, 2014 (Scott); *see also* Mot. *In Limine* at 8.) The Court disagrees. Ms. Putinier's formal education and training—which is not insubstantial—is but one aspect of her overall qualifications. She is further qualified by her extensive field experience while working for the OC Crime Lab. Rule 702 acknowledges that an expert may be qualified not only by education and training but by knowledge, skill, and experience. Accordingly, Ms. Putinier easily meets the standard for qualification to provide expert testimony under Rule 702.

### 2. *Daubert* Factors

■ Defendants further contend that Ms. Putinier's methodology for determining population frequency estimates is not reliable under *Daubert*. Having considered the evidence and testimony presented at the *Daubert* hearing, the Court disagrees. At the *Daubert* hearing, Ms. Putinier testified that she used a technique known as the product rule to determine the frequency of a coincidental match. (*See Daubert* Hr'g Tr. at 11:11–17.) "The product rule takes the expected frequencies of the set of markers (alleles) at a discrete, identified set of locations (loci), from the [sampled DNA] and multiplies those frequencies together to get the random match probability ... for that profile." *United States v. Williams*, No. CR 05–920–RSWL, 2008 WL 5382264, at *17 (C.D.Cal. Dec. 23, 2008). "The [random match probability] represents the chance that a single randomly selected unrelated individual would match the evidence profile by coincidence." *Id.; see also United States v. Chischilly*, 30 F.3d 1144, 1155 n. 14 (9th Cir.1994) ("Under the product rule the probabilities of finding a match at each given locus on the samples satisfying statistical criteria for a match are multiplied together to calculate the random probability that the trace DNA found at the crime scene could have come from another member of the population represented by the defendant."). In this case, the random match probability was determined for each of three common human populations—U.S. Caucasian, African American, and Southwestern Hispanic. The most conservative or common of the frequencies of these three population groups was the only number reported. (*See Daubert* Hr'g Tr. at 33:4–18.)

The Ninth Circuit has held, albeit without a detailed discussion of the *Daubert* factors, that use of the product rule as a

statistical methodology in DNA analysis passes muster under *Daubert*. *See id.* at 1156; *see also Williams*, 2008 WL 5382264, at \* 18 ("Use of the product rule to calculate the rarity statistic easily meets the standards of *Daubert*."); *accord People v. Soto*, 21 Cal.4th 512, 541, 88 Cal.Rptr.2d 34, 981 P.2d 958 (1999) (holding that the unmodified product rule "has gained general acceptance in the relevant scientific community and therefore meets the [*People v.*] *Kelly*, [17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976) ] standard for admissibility"). Considering the record before it, the Court finds that each of the *Daubert* criteria indicate that Ms. Putinier's methodology for determining population frequency estimates is reliable.

First, the testing factor points in favor of admissibility. The product rule has been extensively tested. Notably, the National Research Council Commission on DNA Forensic Science published a report in 1996 (the "NRC 1996 Report"), which concluded that although databases such as those used by Ms. Putinier are based on convenience samples (as opposed to a random sample from the relevant population), "these convenience samples are appropriate for forensic uses" because "empirical tests have shown only very minor differences among the frequencies of DNA markers from different subpopulations or geographical areas." National Research Council, *The Evaluation of Forensic DNA Evidence* 30 (1996), *available at* http://www.nap.edu/catalog/5141.html ("NRC 1996 Report"); *see also United States v. Gaines*, 979 F.Supp. 1429, 1440–41 (S.D.Fla.1997) (finding that the FBI's population databases have been tested by comparing the frequencies that appeared in those databases with other databases and that "[a]lthough there were slight variations between the databases, the frequencies were consistent and established that the FBI's databases contained a sufficient number of samples"). Such testing clearly supports the reliability of Ms. Putinier's statistical analysis.

Second, evidence presented at the *Daubert* hearing establishes that Ms. Putinier's method for determining population frequency estimates has been subjected to peer review and publication. Ms. Putinier testified that, when she applied the product rule to determine the population frequency estimates in this case, she used allele frequencies taken from two published databases: Bruce Budowle, et al., "Population Data on the Thirteen CODIS Core Short Tandem Repeat Loci in African Americans, U.S. Caucasians, Hispanics, Bahamians, Jamaicans, and Trinidadians," *Journal of Forensic Science*, 1999:44(6), 1277–86, and Bruce Budowle, et al., "Population Data on the STR Loci D2S1338 and D19S433," *Forensic Science Communications*, 2001:3(3). (*See Daubert* Hr'g Tr. at 14:16–15:8, 15:15–21.) The authors of these articles tested numerous loci (13 loci for the 1999 publication and 2 loci for the 2001 publication) for several hundred individuals and then determined the population frequencies of each allele at those loci. (*Daubert* Hr'g Tr. at 14:22–15:3.) The published databases contain these allele frequencies for various population subgroups, including U.S. Caucasians, African Americans, and Southwestern Hispanics. (*Id.*) Both databases were published in peer-reviewed journals. (*See id.* at 15:12–14, 15:22–24.) To Ms. Putinier's knowledge, most laboratories in the United States use these databases because they are used by a CODIS software module called Popstats, which is in wide use. (*Id.* at 16:7–17:1.) Additionally, the 1996 NRC Report specifically recommends that the product rule be used to calculate the DNA profile frequency. *See* NRC 1996 Report, Recommendation 4.1; *see also Soto*, 21 Cal.4th at 540–41, 88 Cal.Rptr.2d 34, 981

P.2d 958 (concluding that "extensive literature in peer-reviewed journals has accumulated to support the conclusion that ... use of the unmodified product rule is appropriate to estimate probabilities of a random match"). Ms. Putinier's methodology has thus been featured in numerous publications, including several peer-reviewed publications.

Third, Ms. Putinier's method for determining population frequency estimates has an acceptable rate of error. Numerous courts, as well as the NRC 1996 Report, have concluded that the product rule methodology, performed in accordance with widely accepted standards, has an acceptable rate of error. *See, e.g., United States v. Shea,* 957 F.Supp. 331, 343 (D.N.H.1997) (finding that random match probability calculations adjusted as suggested by the NRC Report satisfy Rule 702), *aff'd,* 159 F.3d 37 (1st Cir.1998); NRC 1996 Report at 160 ("The empirical studies show that the differences between the frequencies of the individual profiles estimated by the product rule from different adequate subpopulation databases (at least several hundred persons) are within a factor of about 10 of each other, and that provides a guide to the uncertainty of the determination for a single profile."). Although Ms. Putinier's DNA reports do not appear to provide any margin of error, it is well established that her methodology has an acceptable rate of error. Thus, this factor weighs in favor of admissibility.

Fourth, there are recognized standards that control Ms. Putinier's method for determining population frequency estimates. At the *Daubert* hearing, Ms. Putinier testified that, in reaching her population frequency estimates, she followed numerous guidelines, including guidelines published by the National Research Council and the Scientific Working Group on DNA Analysis Methods ("SWGDAM"), as well as the OC Crime Lab's own internal guidelines. (*See Daubert* Hr'g Tr. at 18:21–20:5.) Indeed, after the FBI issued new SWGDAM Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories in April 2010, the OC Crime Lab updated its internal guidelines and Ms. Putinier reinterpreted some mixtures that had previously been reported for this case. (*See* Aug. 7, 2013 DNA Report; Jan. 21, 2014 DNA Report.)

In particular, Ms. Putinier testified that she followed guidelines published in the NRC 1996 Report, which recommends use of the product rule, and further recommends that, where possible, the database for the person's race should be used. *See* NRC Report at 5. Here, Ms. Putinier took an approach that was even more conservative: she calculated the frequencies for each of three population groups—U.S. Caucasian, African American, and Southwestern Hispanic—and then reported only the most common (defendant-friendly) frequency. (*Id.* at 33:4–18.) Ms. Putinier also rounded down and truncated the frequencies. (*See id.* at 33:17–20 ("And we didn't report the exact number. Essentially what we do is we call it rounding down and truncating. So if, for example, the result is [one in] 1,700,000,000, we would report [one in] 1 billion.").) *See Shea,* 957 F.Supp. at 343 (finding that random match probability calculations adjusted as suggested by the NRC Report satisfy Rule 702). This factor therefore weighs in favor of admissibility. .

The final factor is whether a method or technique is generally accepted in the relevant scientific community. This factor is also satisfied. Ms. Putinier testified at the *Daubert* hearing that, in performing DNA analysis for this case, she used a particular set of 13 to 15 loci, chosen because it was the same set of loci used in the Budowle databases. (*Daubert* Hr'g Tr. 13:1–9.)

She testified that these loci are generally understood to be independent from one another, a condition necessary to ensure the reliability of using the product rule. (*See id.* at 12:12–17.) She also testified that the Budowle databases' population frequency statistics at each locus are generally accepted as reliable for use in generating a population frequency estimate. (*See generally id.* at 14:16–18:20.) According to Ms. Putinier, the product rule is also generally recognized in the forensic science field. (*See id.* at 11:18–20.)

Ms. Putinier's testimony in this regard is supported by the NRC 1996 Report, which was commissioned for the particular purpose of "updat[ing] and clarify[ing] discussion of the principles of population genetics and statistics as they apply to DNA evidence." NRC 1996 Report at 1. The NRC 1996 Report recommended that "the calculation of a profile frequency should be made with the product rule" the very methodology that Ms. Putinier followed here. Accordingly, federal courts, as well as California courts applying the more restrictive *Kelly/Frye* standard, have held that use of the product rule based on the FBI's DNA databases is generally accepted in the relevant scientific community. *See Gaines,* 979 F.Supp. at 1441 (concluding that "the method for determining random match probability is generally accepted in the scientific community of population geneticists"); *Soto,* 21 Cal.4th at 541, 88 Cal. Rptr.2d 34, 981 P.2d 958 ("It is clear from the evidence in the record, the clear weight of judicial authority, and the published scientific commentary, that the unmodified product rule, as used in the DNA forensic analysis in this case, has gained general acceptance in the relevant scientific community and therefore meets the *Kelly* standard for admissibility."); *see also id.* at 540, 88 Cal.Rptr.2d 34, 981 P.2d 958 (noting that developments such

as a 1993 FBI Report (a worldwide population study), a Lander and Budowle article, and, most significant, the 1996 NRC Report indicate that use of the unmodified product rule is generally accepted).

In sum, each of the *Daubert* factors supports the conclusion that Ms. Putinier's statistical analysis testimony is based on reliable principles and methods. Because Ms. Putinier's expert testimony is both relevant and reliable, it is admissible under Rule 702.

### B. Motion to Exclude Under the Confrontation Clause

■■■ The Sixth Amendment's Confrontation Clause gives the accused "[i]n all criminal prosecutions, . . . the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington,* the Supreme Court interpreted the Confrontation Clause to allow admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Confrontation Clause question thus often turns on whether out-of-court statements are testimonial or nontestimonial. Under *Crawford,* testimonial statements covered by the Confrontation Clause include (1) "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably

to believe that the statement would be available for use at a later trial." *Id.* at 51–52, 124 S.Ct. 1354 (internal quotation marks and citations omitted).

■ Defendants contend that "[t]o the extent Ms. Putinier simply referred to an external program or software to determine her statistics in this case, that testimony would constitute a violation of [their] Sixth Amendment rights under the Confrontation Clause." (Mot. *In Limine* at 8–9.) The Court disagrees. None of these external sources—which could refer to the Popstats software used by Ms. Putinier, the Budowle databases upon which that software relies, or the FBI's CODIS index of DNA profiles—is testimonial. They are not formalized testimonial materials; nor are they statements made primarily for accusing a specific individual at trial. *See Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 2713, 180 L.Ed.2d 610 (2011) (finding no Confrontation Clause problem with expert's reference to a report that "was not prepared for the primary purpose of accusing a targeted individual"). Accordingly, because the external sources relied upon by Ms. Putinier are entirely nontestimonial, her testimony does not violate the Confrontation Clause.

## C. Motion to Exclude Under Rule 403

Rule 403 requires the exclusion of otherwise admissible expert testimony if the probative value of the evidence is substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. Importantly, although a court may find that expert testimony passes muster under Rule 702, the court must "take seriously the Court's admonition in *Daubert* that scientific evidence must withstand close scrutiny under Rule 403." *Chischilly,* 30 F.3d at 1156 (citing *Daubert,* 509 U.S. at 593–96, 113 S.Ct. 2786).

■ In particular, "[w]ith regard to DNA evidence, there are two general tendencies that should be guarded against: (1) that the jury will accept the DNA evidence as a statement of source probability (i.e., the likelihood that the defendant is the source of the evidentiary sample); and (2) that once the jury settles on a source probability, even if correctly, it will equate source with guilt, ignoring the possibility of non-criminal reasons for the evidentiary link between the defendant and the victim." *Id.* The first tendency has been named the "prosecutor's fallacy." The prosecutor's fallacy "is to say that [random match probability] is also the probability that the DNA at the crime scene came from someone other than the defendant."[2] NRC 1996 Report at 133. There is also a "defendant's fallacy," which "is to assume that in a given population, anyone with the same profile as the evidence sample is as likely to have left the sample as the sus-

---

2. For example, suppose that a defendant had a twin sibling with an identical genetic profile who also had an opportunity to commit the crime in question. A forensic analyst takes a DNA swab, identifies that there is a primary contributor, and determines that the defendant's DNA profile matches the sample's profile at all loci that were tested. The forensic scientist concludes that the chance of a random match is one in a trillion unrelated indi- viduals. In that case, it would be a fallacy for the prosecutor to argue that there is only a one-in-one-trillion chance that the DNA came from someone other than the defendant. Such reasoning would improperly ignore the universe of non-DNA evidence relevant to the question of the defendant's guilt or innocence, not the least of which is the fact that the defendant's twin has an identical genetic profile.

pect." *Id.* Both fallacies are widely recognized and should be avoided because they improperly assume that non-DNA evidence is irrelevant. Of course, the prosecutor's fallacy lurks in any DNA case. In this case, however, the Court is confident that the Government, "[c]onfronted with an unusually informed, capable and zealous challenge from the defense, [will be] careful to frame the DNA profiling statistics presented at trial as the probability of a random match, not the probability of [Defendants'] innocence." *Chischilly*, 30 F.3d at 1158.

The same is true of the second concern. To the extent that there is any possibility of non-criminal reasons for Defendants' DNA being found on any of the items or surfaces swabbed and later tested by Ms. Putinier, Defendants' lawyers are very capable of making that argument to the jury.

In making the Rule 403 determination, the Court must also consider the probative value of the evidence. Here, the population frequency estimates are highly probative because without such information the jury cannot properly evaluate the weight to given Ms. Putinier's finding that the DNA samples taken from the scene of the car crash were consistent with Defendants' DNA profiles. *See id.* ("On the other side of the Rule 403 ledger, statistical evidence derived from sample processing and match analysis, properly documented and performed in compliance with established, peer-reviewed laboratory protocols, is certainly probative of the defendant's guilt or innocence."); *Shea*, 957 F.Supp. at 345 ("[B]ecause such an estimate can be extremely valuable in helping the jury appreciate the potential significance of a DNA profile match, it should not be excluded merely because the concept requires explanation."). Thus, considering the high probative value of the population frequency estimates, and the Court's finding that the

parties are capable of ensuring that the jury is not misled by such estimates, the Court declines to exclude the estimates under Rule 403.

## IV. CONCLUSION

The random match probability method employed by the Government's DNA expert is sufficiently reliable to be admissible at trial. The method can be and has been tested, it has been subject to peer review and publication, it has a sufficiently low rate of error, it is subject to standards, and it is generally accepted in the forensic science community. Furthermore, the Court finds that such evidence should not be excluded under the Confrontation Clause or under Federal Rule of Evidence 403. Accordingly, Defendants' motion *in limine* is DENIED.