NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us.

SJC-11385


COMMONWEALTH  vs.  JERMAINE HOLLEY.



Bristol.      September 9, 2016. - December 19, 2016.

Present:  Gants, C.J., Botsford, Gaziano, Lowy, & Budd, JJ.


Homicide.  Grand Jury.  Evidence, Prior misconduct, Expert
    opinion.  Practice, Criminal, Capital case, Grand jury
    proceedings, Prosecutor's conflict of interest, Opening
    statement, Argument by prosecutor, New trial.



Indictment found and returned in the Superior Court
Department on June 29, 2007.

The case was tried before Robert J. Kane , J., and a motion
for a new trial, filed on October 3, 2014, was considered by
him.


David H. Mirsky (Joanne T. Petito with him) for the
defendant.
Shoshana Stern, Assistant District Attorney, for the
Commonwealth.


BUDD, J.  In December of 2011, a jury convicted the

defendant, Jermaine Holley, of murder in the first degree on a

theory of extreme atrocity or cruelty in connection with the death of the victim, Susy Goulart, in April, 2005.[1]

On appeal, the defendant asserts errors in (1) the presence of police officers in the grand jury room while the Commonwealth presented witness testimony in support of the murder indictment; (2) the trial judge's denial of the defendant's motion for the appointment of a special prosecutor; (3) several evidentiary rulings by the trial judge; (4) the prosecutor's opening statement and closing argument; and (5) the trial judge's denial of his motion for a new trial.  The defendant also seeks relief under G. L. c. 278, § 33E.  After full consideration of the trial record and the defendant's arguments, we affirm the defendant's conviction and the denial of his motion for a new trial, and we decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.

Background.  We summarize the facts the jury could have found, reserving certain details for discussion of specific issues.  The victim lived in a multibuilding public housing development in Fall River.  On the day of her death, the victim's former friend and neighbor, Patricia Moran, moved out of her apartment because she had been evicted as the result of both nonpayment of rent and a then-pending criminal charge of

---

[1] The jury declined to convict the defendant of murder in the first degree on a theory of deliberate premeditation.

assaulting the victim during a dispute over a debt.  Moran's boy friend and his brother, the defendant, had often visited Moran at the development.  The defendant was among those who helped move Moran's belongings into a truck after which the group drank alcohol outside her building.  The defendant told one of these people that the victim owed Moran money.  The defendant was still at Moran's building at approximately 8 P.M.  At approximately 9 P.M., a neighbor saw the victim walking home from the direction of Moran's building.  The victim then stopped to smoke a cigarette while with her downstairs neighbors near the back door of her own building.  As the victim was walking upstairs afterward, the neighbors saw an African-American man also walk upstairs.  He did not respond when the victim asked him, "Are you here for me?"  The hood the man was wearing blocked most of his face.  Earlier in the day, a resident had seen the defendant wearing a "hoodie."

Soon after the victim and the man walked up the stairs, the neighbors she had been smoking with heard the victim's apartment door lock and then the sound of loud music.  A neighbor who lived next door to the victim, also heard people enter the apartment.  Later, this neighbor heard a scream but could not tell the source.  Shortly after that, she saw smoke coming from the victim's apartment and telephoned the fire department.  No one saw or heard anyone else enter or leave the apartment, and

the victim did not answer her friend's telephone calls at 10:13 P.M. and 11:32 P.M.

Police, fire fighters, and paramedics responded to the scene. A pot on the stove was on fire, blood was seen throughout the living room and kitchen, and the victim was dead on the floor, wearing only a shirt and holding a severed telephone line. An autopsy showed that she had died as a result of forty stab wounds and thirteen cutting wounds. The knife used in the killing was never found.

Investigators took samples of blood, clothing (including a bloody sock), and powder and gelatin lifts of fingerprint and footwear impressions from the victim's apartment, as well as fingernail scrapings, a blood sample, and oral, vaginal, and anorectal swabs from the victim's body. The State police crime laboratory compared deoxyribonucleic acid (DNA) samples from the evidence collected to DNA samples from the victim, the defendant, the defendant's brother, and the first police officer to respond to the fire. Over the course of the investigation, the police also found and seized a pair of the defendant's shoes, the soles of which were consistent with footprint impressions found in blood in the victim's apartment.

Residents of the housing complex told police that they had seen the defendant with a knife on the day the victim was killed. At around noon, the defendant showed his knife to one

resident who had stopped by Moran's apartment. It was approximately eleven inches long with a black handle and black sheath. That afternoon, the defendant visited another resident's apartment to demand money that the resident's former boy friend owed to the defendant. When the resident told the defendant that she was not responsible for the debt, the defendant lifted his hoodie and shirt to show her a knife with a black and silver handle in a "holster," and said he would be back. A third resident, José Torres, said that the defendant had waved a large knife at Torres and his friends on the day of the murder.

Five days after Goulart's death, the police went to speak with the defendant. He was brought to the police station, where an officer noticed a cut on the defendant's hand. A test for blood on both of his hands was negative.

After giving the defendant the Miranda warnings, the police interviewed him about the victim's death. During the interview, the defendant denied being at the housing complex on the day of the murder and denied knowing personally or having sex with the victim (he even initially denied knowing Moran).[2] He also falsely stated that he and his girl friend had gone to Newport,

---

[2] Vaginal and anorectal swabs taken from the victim both contained two deoxyribonucleic acid (DNA) profiles: hers and the defendant's. At trial, the fact that the defendant and the victim had sex on the day of the murder was uncontested.

Rhode Island, on the day of the victim's death.  When the police asked the defendant if he could think of anything worse than murder, he said, "You can snitch on somebody.  That's like taking somebody's life."  At some point, the defendant apparently had told his girl friend that the victim was a snitch.

At trial, the defendant pointed to the victim's former boy friend as the murderer, suggesting that the police had narrowed their search too quickly to African-American men, and highlighting a number of reasons that the boy friend had to kill the victim, including their turbulent relationship and the fact that she had had sex with the defendant.  The defendant also presented evidence that the boy friend had been in the housing complex on the day of the murder.  The defense stressed the lack of fingerprint evidence linking the defendant to the murder and argued that the number and type of stab wounds were indicative of the victim's boy friend's obsession with and anger at her. The victim's boy friend had been seen elsewhere on the evening of the murder.

2.  Discussion.  a.  Unauthorized persons in the grand jury room.  In the defendant's motion for a new trial, and again on appeal, he argued that his indictment must be dismissed because of the presence of unauthorized persons in the grand jury room. Two police officers involved in the investigation of this case,

who were witnesses before the grand jury in the matter, were present in the grand jury room for most, if not all, of the other witnesses' testimony. Both parties agree that the officers' presence was improper. The defendant contends that this error rendered his indictment void ab initio, requiring not only the vacation of his conviction but also the dismissal of the indictment under the United States Constitution and the Massachusetts Declaration of Rights. Alternatively, the defendant argues that if the indictment was not void, he is nevertheless entitled to a new trial based on the ineffective assistance of trial counsel, who failed to move to dismiss the indictment or even to raise the issue prior to trial. We conclude that the indictment was voidable rather than void, and that, in this case, the defendant has failed to show that he was prejudiced by either the grand jury irregularity or his counsel's failure to raise the issue.

Secrecy is of fundamental importance to grand jury proceedings, not only to protect the reputation of the accused, but also "to shield grand jury proceedings from any outside influences having the potential to 'distort their investigatory or accusatory functions.'" Commonwealth v. Pezzano, 387 Mass. 69, 73 (1982), quoting Opinion of the Justices, 373 Mass. 915, 918 (1977). A limited category of authorized persons, such as counsel for witnesses, interpreters, court officers, and

stenographers, may be present during grand jury proceedings.[3]
See Mass. R. Crim. P. 5 (c), as appearing in 442 Mass. 1505
(2004); Pezzano, supra at 72 n.5.  This court has disapproved of
the presence of "unauthorized" individuals, especially
investigating police officers, because their presence has the
potential to compromise the integrity of the process by, among
other things, influencing witness testimony through
intimidation.  Pezzano, supra at 74-75.  In Opinion of the
Justices, 232 Mass. 601, 604 (1919), we stated that the
"essential characteristics of the grand jury would be broken
down if a police officer or other person who had investigated
the evidence, interviewed the witnesses, and formulated a plan
for prosecuting the accused should be permitted to be present
during the hearing of testimony. . . .  The attendance of a
police officer would afford opportunity for subjecting witnesses
to fear or intimidation, for preventing freedom of full
disclosure by testimony, and for infringing the secrecy of the
proceedings."  Accordingly, we have held that "the presence of
an unauthorized person before a grand jury will void an

---

[3] Rule 5 (c) of the Massachusetts Rules of Criminal
Procedure, as appearing in 442 Mass. 1505 (2004), provides in
relevant part:  "Attorneys for the Commonwealth who are
necessary or convenient to the presentation of the evidence, the
witness under examination, the attorney for the witness, and
such other persons who are necessary or convenient to the
presentation of the evidence may be present while the grand jury
is in session."

indictment." Pezzano, supra at 72-73, citing Commonwealth v. Harris, 231 Mass. 584, 586-587 (1919). In Pezzano, supra at 70, and Harris, supra at 585, the defendants challenged their indictments prior to trial. Here, however, the defendant did not contest the validity of the indictment until after his trial and conviction. Thus, we must determine whether the presence of unauthorized persons during grand jury proceedings automatically voids an indictment even in cases where there is no challenge made until after conviction.

The defendant's right to indictment by a grand jury is protected by the Massachusetts Declaration of Rights.[4] Harris, 231 Mass. at 585-586; Jones v. Robbins, 8 Gray 329, 347 (1857). By waiting until after his conviction, however, the defendant has waived his right to object under Massachusetts law to

---

[4] There is no Federal constitutional right to a grand jury indictment in State proceedings. Apprendi v. New Jersey, 530 U.S. 466, 477 n.3 (2000). Where a State does provide a right to a grand jury, however, it must implement this right in accordance with the United States Constitution. Rose v. Mitchell, 443 U.S. 545, 557 n.7 (1979). The Supreme Court has held that a violation of Fed. R. Crim. P. 6 (d), which precludes unauthorized persons from Federal grand jury proceedings, does not require an automatic dismissal of the subsequent conviction. See United States v. Mechanik, 475 U.S. 66, 70 (1986) (trial jury's guilty verdict "means not only that there is probable cause to believe that [a] defendant[] [is] guilty as charged, but also that [he or she is] in fact guilty as charged beyond a reasonable doubt"). Thus, the United States Constitution does not render the defendant's indictment void ab initio for such a deficiency in a State proceeding.

defects in the underlying grand jury proceeding.[5] G. L. c. 277, § 47A (failure to object to grand jury defects before trial constitutes waiver). See Mass. R. Crim. P. 13 (c) (2), as appearing in 442 Mass. 1516 (2004) (motion to dismiss must be raised before trial). Compare Commonwealth v. Barbosa, 421 Mass. 547, 553 (1995) (right to object to indictment not waived and properly preserved where defendant moved to dismiss before trial), with Commonwealth v. Mayfield, 398 Mass. 615, 622 n.4 (1986) ("alleged flaws in the grand jury proceedings, argued on appeal for the first time, are not generally before us because they were not seasonably asserted"). Thus the defendant must show that the grand jury irregularity caused a substantial likelihood of a miscarriage of justice in the trial jury's verdict. See Mayfield, supra.

The defendant has not shown that the presence of the police officers caused those who testified before the grand jury to feel coerced or intimidated.[6] The majority of the grand jury witnesses testified again at trial, where they were subject to

---

[5] The defendant points out that defenses and objections "based upon . . . the failure to charge an offense . . . shall be noticed by the court at any time." G. L. c. 277, § 47A. The issue here is not a failure to charge, but rather a defect in the grand jury process that culminated in the charge.

[6] The affidavits presented in support of the defendant's motion for a new trial did not state that the officers' presence caused any coercion or intimidation -- only that the officers were present.

cross-examination by the defendant, and the trial jury found the defendant guilty beyond a reasonable doubt.

Moreover, the only portion of the grand jury testimony that the trial judge admitted substantively was the testimony of Torres, after the judge properly found that he was feigning a lack of memory on the stand. See Commonwealth v. McGhee, 472 Mass. 405, 422-423 (2015), citing Commonwealth v. Sineiro, 432 Mass. 735, 745 & n.12 (2000). See also Mass. G. Evid. § 801(d)(1)(A) (2016). As to this testimony, however, the defendant has failed to demonstrate that Torres was influenced in any way by the presence of officers in the grand jury room. The trial judge conducted a voir dire examination of Torres before he testified at trial. During his voir dire examination and thereafter before the trial jury, Torres confirmed that he had taken an oath and had answered questions before the grand jury to the best of his ability.[7] He did not recant any of the detailed statements he made to the grand jury or indicate that

---

[7] Torres had testified before the grand jury that the defendant had threatened him and several other teenage residents with a large knife. Torres told the grand jury that the defendant had gotten angry because two girls made fun of him for stumbling down a hill while drunk. Torres also stated that he recognized the man from a previous snowball fight and from playing basketball. He identified the man as "Jermaine" and described him as approximately six feet, three inches tall, of medium build, and frequently driving a silver motor vehicle. At trial, however, Torres stated that some "random dude" who was African-American pulled a knife on him.

he had felt intimidated in any way by the officers' presence. Finally, even if Torres's grand jury testimony about seeing the defendant with a knife had been tainted, there was other evidence from which the jury could have found that the defendant had a knife on the day of the murder, including that he had threatened another resident with that knife.

Therefore, the defendant has not shown that the presence of investigators during the grand jury proceedings caused a substantial likelihood of a miscarriage of justice such that his indictment must be voided after a conviction. Moreover, because the defendant failed to make this showing, his claim for ineffective assistance of counsel must also fail, even assuming that it was error for his counsel not to challenge the indictment. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014) (under § 33E review, ineffective assistance of counsel claim is reviewed under substantial likelihood of miscarriage of justice standard).

b. Motion for appointment of a special prosecutor. An assistant district attorney (attorney) in the Bristol County District Attorney's office was formerly in private practice with the prosecutor in this case. While in private practice, the attorney had represented the defendant in a prior, unrelated

criminal matter.[8] For this reason, prior to trial the defendant moved for a special prosecutor, i.e., someone from outside the Bristol County district attorney's office, to prosecute the case.[9] At the motion hearing and in the Commonwealth's response to the defendant's motion, the prosecutor represented to the judge that the attorney had been screened from any involvement in the case and never shared any knowledge of the defendant with the prosecutor.[10] The defendant nevertheless argues that the denial of his motion constitutes reversible error. We disagree.

Complete disqualification of an entire district attorney's office and the appointment of a special prosecutor are not

---

[8] The representation of the defendant in the prior matter spanned approximately four months and took place seven years prior to the trial in this matter; all of the charges against the defendant were dismissed.

[9] The defendant cited a press release describing the attorney and the prosecutor as "influential in helping [the district attorney's] office bring charges against suspects in three previously unsolved murder cases," including this case, as evidence that the attorney had worked on this case. The defendant argues that the fact that the Commonwealth did not inform him of the attorney's employment and that the defendant did not consent to the prosecution of the matter by the Bristol County district attorney's office, in essence, should create a presumption against the office.

[10] According to the prosecutor, he reviewed the file and informed the attorney that there was a potential match between the defendant and some DNA recovered at the crime scene. The attorney stated he might have represented the defendant, which he confirmed after reviewing his records. As a result, the attorney was never assigned to and was never involved in the investigation of this case.

required when a lawyer who previously represented a defendant currently being prosecuted by the district attorney's office joins that office.  See Mass. R. Prof. C. 1.11 comment [2], as appearing in 471 Mass. 1370 (2015) ("Because of the special problems raised by imputation within a government agency, paragraph [d] [providing rules for lawyers serving as public officers or employees] does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees");[11] Mass. R. Prof. C. 1.10 (f) and comment [4], as appearing in 471 Mass. 1363 (2015) (rules of imputation are different for lawyers serving as public employees); Pisa v. Commonwealth, 378 Mass. 724, 727-728 (1979).  Instead, rule 1.11 (d) (2) provides, "[A] lawyer currently serving as a public officer or employee . . . shall not . . . participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment."[12]

---

[11] The earlier version of this rule, in effect at the time of the defendant's motion for appointment of a special prosecutor, provided essentially the same protection, stating that disqualification of one public employee "[did] not disqualify other lawyers in the agency with which the lawyer in question [had] become associated."  Mass. R. Prof. C. 1.11 comment [9], 426 Mass. 1352 (1998).

[12] An identical version of this provision was previously located at Mass. R. Prof. C. 1.11 (c) (1), 426 Mass. 1352 (1998).

The attorney who formerly represented the defendant did not participate in this case. In addition, the prior association between the prosecutor and the attorney in private practice disqualifies neither the prosecutor nor the district attorney's office where, as here, the prosecutor affirms that he did not represent the defendant and had no actual knowledge of him.[13] See Mass. R. Prof. C. 1.9 comment [5], as appearing in 471 Mass. 1359 (2015) (no disqualification where lawyer did no work on matter and acquired no information about the client).[14] There has been no showing that any confidential information was ever imparted to the prosecutor, much less used against the defendant at trial. There was no error in denying the defendant's motion for appointment of a special prosecutor.

c. <u>Evidentiary rulings</u>. i. <u>Prior bad act testimony</u>. As discussed, at trial, one resident testified that on the day of the homicide, the defendant lifted his hoodie to show her a large knife during a dispute about a debt. In addition, Torres stated in his grand jury testimony, which was admitted in

---

[13] The prosecutor told the motion judge that the attorney had represented hundreds of criminal defendants during his time in private practice, but that the two did not discuss these cases. In addition, they maintained separate offices and filing cabinets relating to their cases.

[14] Comment [9] to rule 1.10 of the Massachusetts Rules of Professional Conduct, 426 Mass. 1346 (1998), articulated the same principle.

evidence at trial, that the defendant had waved a knife at Torres and his friends.  The defendant argues that the probative value of this prior bad act evidence did not outweigh its prejudicial nature, and that the case was overwhelmed with prior bad act evidence.  We disagree.

Although prior bad act evidence is generally inadmissible to show one's propensity to commit a crime, such evidence may be admitted, "if relevant, for some other purpose, such as proving common scheme, pattern of operation, preparation, opportunity, nature of relationship, knowledge, intent, motive, identity, . . . absence of accident or mistake," Commonwealth v. Cheremond, 461 Mass. 397, 408 (2012), or state of mind, Commonwealth v. Howard, 469 Mass. 721, 738 (2014).  See Mass. G. Evid. § 404(b)(2) (2016).

Here, the evidence was relevant to show that the defendant had access to a knife that could have been used in committing the murder, particularly given the medical examiner's testimony about the size and depth of the victim's stab wounds.  See Commonwealth v. Toro, 395 Mass. 354, 356 (1985).  The fact that the defendant lifted his hoodie to show the knife to a resident was probative of identity, given that the last person seen entering the victim's apartment was wearing a hoodie.  The defendant's effort to collect on a debt was relevant to show motive, as he had discussed the victim's debts with another

person on the day she died.  The testimony was also probative of the defendant's state of mind, as both the resident and Torres testified about acts that took place shortly before the murder. We note that the judge limited consideration of Torres's grand jury testimony to consideration of "the identity of the person who he saw with a knife."

Moreover, given the amount of other evidence of the defendant's guilt, the bad act evidence was not overwhelming. The defendant had sex with the victim on the day she died, and the jury could have inferred that he had left footprints in her blood.  He lied about his alibi and denied knowing the victim well or having sex with her -- until DNA evidence showed otherwise.  Initially, he denied being at the housing complex that day or knowing his brother's girl friend, even though he had been there to help her move.  He had a cut on his hand five days after the murder and encouraged his girl friend not to testify at trial.  In the face of this evidence, much of which showed consciousness of guilt, the testimony about prior bad acts was not overwhelming.

Therefore, the judge did not abuse his discretion in admitting the testimony.

ii.  Reliability of shoe print analysis.  The defendant contends that the judge committed reversible error in allowing a Commonwealth expert to testify about whether it was possible to

match the defendant's shoes to prints found in the victim's blood, arguing that the opinion was based on unreliable methods. We disagree.

The Commonwealth introduced evidence including gelatin lifts of shoe prints found in the victim's blood, the defendant's shoes, and photographs of the shoes' soles.  The Commonwealth's experts testified that the prints were consistent with the model of the shoe and that gum and pebbles were retrieved from the soles of the defendant's shoes.[15]  The totality of the evidence introduced by the Commonwealth would support a conclusion that shoes of the type the defendant owned had been in the victim's blood.  The judge ruled that the prosecutor could introduce testimony related to individual characteristics of the defendant's shoes and characteristics of the shoes' model generally, but the judge instructed the jury that the final determination of any "match" between the shoes and the shoe prints found at the crime scene would be left to them.

At sidebar in response to an anticipatory objection by defense counsel, the judge held a voir dire examination of one of the Commonwealth's expert witnesses, who had worked with lifts of the shoe prints but not with the shoes.  The

---

[15] The defendant does not contest that the shoes belonged to him.

Commonwealth sought to elicit testimony related to the expert's method of recognizing an "anomaly" on the lift of a shoe print impression and determining what caused the anomaly. The judge asked the expert questions related to the reliability of his method, based on the expert's twenty-five years of experience in crime scene investigation, his level of certainty regarding his findings, and his explanation of how items stuck to the bottom of shoes could affect a shoe print. The judge decided to allow limited testimony on the subject.[16]

The Commonwealth's expert testified that a characteristic such as stones or gum could "sometimes be used to make a positive identification" of a particular shoe, "but it's rarely done with a single identifying characteristic." In response to a hypothetical question, the expert also said that it would be possible for him to match a shoe to a gelatin lift.

Expert opinion testimony based on a reliable process or theory is admissible where "specialized knowledge would be helpful" to the jury. Commonwealth v. Pytou Heang, 458 Mass.

---

[16] The judge agreed that the witness could describe what he saw with respect to the footwear impressions and that the gelatin lifts showed an "anomaly" due to a characteristic of the shoe. However, the judge ruled that the witness could not state what caused the identifying characteristic and that the concept of a "match" must be left to the jury's own determination. The witness referred only to the possibility of matching identifying characteristics, but did not say that any particular shoe was a positive match.

827, 844 (2011).  The trial judge "has broad discretion to determine how to assess the reliability of expert testimony." Palandjian v. Foster, 446 Mass. 100, 111 (2006).  Here, the judge did not abuse his discretion in determining that the method was reliable because the fact that someone could potentially match a shoe print to a shoe based on items stuck to the shoe made sense, particularly in light of the expert's experience and explanation during the voir dire examination. See Commonwealth v. Torres, 469 Mass. 398, 406-408 (2014) (expert testimony comparing defendant's footwear to impressions made in blood at crime scene was admissible to assist jury and was properly introduced where "[i]t was made clear to the jury that this was a matter they could weigh for themselves").  We note that the expert qualified the value of any comparison, and that the defendant had the opportunity to challenge the validity of the testimony through cross-examination.  See Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994).  There was no error.

d.  Prosecutor's opening statement and closing argument. The defendant also alleges that improper statements made by the prosecutor during his opening statement and closing argument warrant reversal because they materially misled the jury.

i.  Opening statement.  The defendant alleges two errors in the opening statement.  First, the prosecutor told the jury that the defendant's shoes tested positive for occult blood and for

human DNA, "but not enough to give a conclusive result." Where inconclusive DNA evidence is not "probative of an issue of consequence," it is inadmissible. Commonwealth v. Nesbitt, 452 Mass. 236, 254 (2008). The defendant objected at the time of the prosecutor's reference to the DNA, and the judge immediately gave a curative instruction to the jury.[17] Considering the judge's forceful contemporaneous instruction and his general instruction to the jury before the opening statement to the effect that the opening was not evidence, and because we "presume[] the jury understood and followed" the judge's instructions, the prosecutor's improper comment did not prejudice the defendant. See Commonwealth v. Thomas, 429 Mass. 146, 158 (1999).

Second, the defendant claims that the prosecutor's reference in his opening to DNA evidence from the bathroom sink[18]

---

[17] The judge told the jury, "I sustain the objection. I said that DNA evidence that has no figure attached to it means nothing. It is to be disregarded by this jury. Totally disregarded."

[18] The prosecutor stated:

"When they go to the sink knobs, you'll hear they find a mixture. The major -- there's a mixture of a larger amount and a smaller amount. The larger amount they'll say -- they'll find the blood was [the victim's}. There's also DNA that's found in the mixture, the minor profile, which is consistent with the defendant's profile; and in fact the statistical analysis on finding somebody else in a random

impermissibly misled the jury because it implied that there was "less than one-third of one percent" probability that the defendant was innocent.  However, the prosecutor's remark did not refer to a likelihood of guilt or innocence, but instead was an attempt to explain how likely it was that the consistency between the defendant's DNA and the sample was a coincidence. The remarks did not track the exact formulation of the "random match probability" statistic, but his use of the words "consistent" and "random drawing" conveyed the same general idea.  See Commonwealth v. Bizanowicz, 459 Mass. 400, 407 n.13 (2011) ("The random match probability . . . calculation measures how rare a given DNA sample is among the general population"); United States v. Pritchard, 993 F. Supp. 2d 1203, 1209 (C.D. Cal. 2008) ("The [random match probability] represents the chance that a single randomly selected unrelated individual would match the evidence profile by coincidence" [citation omitted]).  There was no error.

Moreover, as with closing arguments, we consider any improper remarks in the opening statement "in light of the 'entire [statement], as well as in light of the judge's

---

drawing of people in the African-American community would be one in 305.  So less than one-third of 1%."

The prosecutor had previously described the statistic as "the likelihood that somebody else having that profile would be found in the African-American population."

instruction to the jury and the evidence at trial.'"
Commonwealth v. Ortiz, 463 Mass. 402, 415 (2012), quoting
Commonwealth v. Raposa, 440 Mass. 684, 694 (2004).  The lack of
objection to this statement, the judge's earlier charge
explaining that opening statements are not evidence, and the
detailed expert testimony on random match statistics made the
prosecutor's imprecise phrasing of the random match probability
relatively inconsequential in the context of the entire trial.
See Commonwealth v. Jones, 439 Mass. 249, 260-261 (2003),
quoting Commonwealth v. Thomas, 429 Mass. at 158 (prosecutor's
opening statement "must be judged in light of the entire
[statement], the judge's instructions to the jury, and the
evidence actually introduced at trial").

     ii.  Closing argument.  The defendant also points to two
portions of the Commonwealth's closing argument as error.
First, the prosecutor stated that blood found on the bathroom
light switch contained DNA profiles belonging to three people --
that one belonged to the victim and the other two profiles were
insufficient for testing.[19]  He argued that "the [S]tate lab was
actually more discriminating, picked up two small minute samples

_____

     [19] This was a misstatement of the evidence -- the
Commonwealth's expert testified that there was one other profile
present, not two -- but the defendant does not object to this
characterization of the evidence, presumably because it tends to
support his third-party culprit theory.

that they can't even do further testing on" and, moreover, that the defense expert testified that there was only one contributor to the light switch sample. He also asked the jury to infer that the blood on the light switch was left by the first officer to respond to the scene, based on the officer's testimony. The defendant argues that this was improper because the prosecutor impermissibly relied on inconclusive DNA evidence to support his inference that a third-party culprit was not responsible for the blood on the light switch.[20]

The judge agreed that the prosecutor had misstated the evidence and gave a curative instruction to the jury to clarify that the defendant had been excluded as a possible contributor

---

[20] The defendant also argues that the Commonwealth improperly introduced the underlying DNA evidence because the comparison between the sample and the officer's DNA was inconclusive. Experts for both parties agreed that the sample from the light switch contained DNA belonging to the victim and to one other person. Because there was so little minor profile DNA present, the defense expert concluded that there was essentially one contributor to the sample -- the victim. The Commonwealth's expert testified that the fraction of minor profile DNA that was present was sufficient to exclude the defendant as a contributor to the sample, but insufficient to make any conclusive comparison to the officer's DNA. In light of the efforts by the prosecutor, the judge, and the testifying expert to clarify that the result meant that the information was too limited to do more definitive testing, the admission of nonexclusive evidence was not in error. See Commonwealth v. Mattei, 455 Mass. 840, 855 (2010).

to the DNA on the light switch.[21] See Commonwealth v. Tu Trinh, 458 Mass. 776, 789 (2011) (specific curative instruction deemed sufficient to mitigate possible prejudice). The defendant did not object at trial to the rest of the statement -- that the officer had touched the light switch. In light of the fact that the defense expert said that only one profile was present and that defense counsel did not discuss the light switch in the closing argument, the prosecutor's comments were unlikely to affect the third-party culprit defense. In addition, this was a collateral issue and the officer had already testified about his actions that night, so the prosecutor's misstatement was unlikely to have had any effect on the verdict, let alone create a substantial likelihood of a miscarriage of justice.

The second allegedly improper argument was that the gelatin lift of the shoeprint "matche[d]" the photograph of the sole of the defendant's shoe. "This is then in the blood. This then tests positive for blood. Do we expect to have blood on our shoes? These shoes were in [the victim's] blood. This was after he killed her." Although defense counsel objected to these statements following the Commonwealth's closing argument,

---

[21] The judge stated, "Jurors, I want you to know and I want you to keep in mind that the evidence in this case indicated that the defendant was excluded from what was left in the area of the light switch. So bear that in mind in deliberating upon this case."

we agree with the trial judge that these statements by the prosecutor did not materially mislead the jury because the argument was based on inferences that the jury could have made from the evidence presented at trial.  Commonwealth v. Guy, 441 Mass. 96, 110 (2004) ("Prosecutors must limit the scope of their closing arguments to facts in evidence and the fair inferences that may be drawn therefrom").

e.  Motion for new trial.  The issues raised in the defendant's motion for a new trial are essentially the same as those raised in his direct appeal.  For the reasons we have already discussed, and because the defendant did not explain the reasons an evidentiary hearing was necessary, the judge was well within his discretion to deny the motion without a hearing.  Commonwealth v. Vaughn, 471 Mass. 398, 404 (2015).  Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001).

3.  Conclusion.  After reviewing the entire record, we discern no reason to exercise our power under G. L. c. 278, § 33E.

Judgment affirmed.

Order denying motion for
new trial affirmed.